# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

JOHN COFFIN and CYNTHIA COFFIN,

      Plaintiffs,

v.                                        CASE NO: 8:07-cv-835-T-26TBM

STACY BRANDAU, f/k/a Stacy Ferris,
individually, and JAMES LUTZ, individually,

      Defendants.

_____/


## O R D E R

Before the Court is Plaintiffs' Motion for Summary Judgment and Statement of Undisputed Facts (Dkts. 43 & 44), Defendant Stacy Brandau's Response (Dkt. 60), Defendant James Lutz' Response (Dkt. 59), Defendant Stacy Brandau's Motion for Summary Judgment (Dkt. 49), Plaintiff's Response (Dkt. 57), Defendant James Lutz' Motion for Summary Judgment and Statement of Undisputed Facts (Dkts. 53 & 48), and Plaintiff's Response.  (Dkt. 58).  After careful consideration of the motions, the applicable law, and the entire file, the Court concludes that Plaintiffs' motion should be denied, and the Defendants' motions should be granted on the basis of qualified immunity.

## BACKGROUND

The Plaintiffs, Cynthia and John Coffin, live together as husband and wife in a home in Sarasota County, Florida.  In this action, Plaintiffs sue two deputies in their individual capacities for violations of each Plaintiff's civil rights pursuant to 42 U.S.C. § 1983 for events that occurred on April 18, 2006.  Mr. Coffin seeks relief based on the warrantless entry into his home only, not his arrest thereafter.  Mrs. Coffin sues for both the alleged illegal entry and her warrantless arrest.

The following events transpired when Defendant Lutz attempted to serve a temporary injunction on John Coffin, which had been obtained by one of his tenants.  In view of the cross motions for summary judgment, the facts must be viewed in the light most favorable to the non-moving party as to each motion.  See Chambliss v. Louisiana - Pacific Corp., 481 F.3d 1345, 1349 (11th Cir. 2007).  Each of the four parties' testimony is set forth, and because the Defendants seek relief based on qualified immunity, the facts will be taken in the light most favorable to the Coffins.

### Deputy Lutz

As Deputy Lutz approached the Coffin home at approximately 6:30 p.m., he noticed that the garage door was open and the curtains were drawn back in the bay window on the front of the house, permitting him to see inside the house.[1]  When he

---

[1]  See docket 27, Depo. Lutz at pp. 25, 31 & 32.

reached the front door, he rang the doorbell.[2]  Mrs. Coffin[3] answered the door and Deputy

Lutz told her that he had some papers for Mr. Coffin.[4]  Mrs. Coffin told him that he was

in the bathroom, and Deputy Lutz told her that he would wait.[5]  After a few minutes

passed, Deputy Lutz walked down the sidewalk, looked in the bay window, made eye

contact with Mrs. Coffin, and motioned to the papers that he held above his head.[6]

Deputy Lutz walked back to the door, at which time he thought he overheard a man's

voice inside the house questioning the woman who had answered the door.[7]  When no one

came to the door, he knocked or rang the doorbell again.[8]  No one opened the door this

time, and he walked through some bushes to reach the bay window.[9]  At that point, Mrs.

---

[2]  <u>See</u> docket 27, Depo. Lutz at p. 32.

[3]  It is undisputed that Deputy Lutz did not know for certain that the woman was Mrs. Coffin, but her actions that followed gave him reason to believe that she was Mr. Coffin's wife.

[4]  <u>See</u> docket 27, Depo. Lutz at pp. 32-33.

[5]  <u>See</u> docket 27, Depo. Lutz at pp. 33-34.

[6]  <u>See</u> docket 27, Depo. Lutz at pp. 36-37.

[7]  <u>See</u> docket 27, Depo. Lutz at pp. 36-37.

[8]  <u>See</u> docket 27, Depo. Lutz at p. 37.

[9]  <u>See</u> docket 27, Depo. Lutz at p.38.

Coffin began yelling at him through the bay window to stay back and leave her property or she would call the police.[10]  Deputy Lutz was wearing his sheriff's deputy uniform.[11]

At this point, Deputy Lutz had not actually seen a male inside the house----only Mrs. Coffin.[12]  He returned to his vehicle and called for back-up because he believed the Coffins were avoiding service.[13]  Deputy Brandau came to the house in a few minutes.[14]  After she arrived, Deputy Lutz saw a man inside the house through the bay window, which was Mr. Coffin.[15]  Both deputies were standing about five feet from the open garage door within sight of the bay window when he heard the automatic garage door mechanism start from the inside.[16]  He realized the garage door was beginning to close and he saw Deputy Brandau break the electronic eye safety beam for the garage door, thereby preventing the garage door from closing.[17]  Both deputies entered the garage.[18]

---

[10]   See docket 27, Depo. Lutz at p. 39.

[11]   See docket 27, Depo. Lutz at p. 39.

[12]   See docket 27, Depo. Lutz at pp. 40-41.

[13]   See docket 27, Depo. Lutz at pp. 41-42.

[14]   See docket 27, Depo. Lutz at p. 45.

[15]   See docket 27, Depo. Lutz at pp. 49-50.

[16]   See docket 27, Depo. Lutz at pp. 48-49.

[17]   See docket 27, Depo. Lutz at pp. 51-52.

[18]   See docket 27, Depo. Lutz at pp. 52-53.

Deputy Brandau knocked on the interior door leading from the garage to the house.[19] Mrs. Coffin opened the interior door and stepped out into the garage, yelling for them to leave her property.[20]  According to Deputy Lutz, both deputies backed out of the garage.[21] After they have backed out of the garage, Mrs. Coffin told them that Mr. Coffin was not there.[22]

Mrs. Coffin's statement caused the deputies to move toward her, back inside the garage, because the deputies were going to arrest Mrs. Coffin for obstructing justice.[23] Deputy Brandau told Mrs. Coffin that she was going to go to jail and both deputies proceeded to attempt to handcuff her.[24]  Before she was handcuffed, Mr. Coffin came into the garage and hit Deputy Brandau two times.[25]  A struggle ensued in which Mr. Coffin was trying to pull his wife back into the house, and the deputies were trying to keep Mrs. Coffin in the garage and arrest her.[26]  All four of them ended up in the kitchen.[27]  Once

---

[19]   See docket 27, Depo. Lutz at pp. 54 & 60.

[20]   See docket 27, Depo. Lutz at p. 60.

[21]   See docket 27, Depo. Lutz at p. 61.

[22]   See docket 27, Depo. Lutz at p. 61.

[23]   See docket 27, Depo. Lutz at p. 62.

[24]   See docket 27, Depo. Lutz at pp. 64-66.

[25]   See docket 27, Depo. Lutz at p. 65.

[26]   See docket 27, Depo. Lutz at pp. 66-67.

[27]   See docket 27, Depo. Lutz at pp. 68-69.

inside the house, Mr. Coffin "took swings" at each of deputies.[28]  Deputy Brandau fired her taser, hitting Mr. Coffin; however, Mr. Coffin continued to fight after he was shot by the taser.[29]  Mr. Coffin then grabbed the taser from Deputy Brandau and hit Deputy Lutz three times near the head with the taser.[30]  Deputy Lutz suffered a head injury from the third blow with the taser.[31]  He fell unconscious momentarily.[32]  He was aroused by a loud noise and then heard a metallic click, which was the sound of the interior door between the kitchen and the garage locking.[33]  He knew that Mr. Coffin had locked Deputy Brandau out of the house, leaving her inside the garage, and Deputy Lutz drew his gun on Mr. Coffin.[34]  At that point, back-up deputies were at the scene, and the Coffins were arrested.[35]

---

[28]   See docket 27, Depo. Lutz at pp. 69-72.

[29]   See docket 27, Depo. Lutz at pp. 75-76.

[30]   See docket 27, Depo. Lutz at pp. 79-80.

[31]   See docket 27, Depo. Lutz at pp. 79-80.

[32]   See docket 27, Depo. Lutz at pp. 84-86.

[33]   See docket 27, Depo. Lutz at p. 81.

[34]   See docket 27, Depo. Lutz at pp. 81-83.

[35]   See docket 27, Depo. Lutz at pp. 84–85.

**Deputy Brandau**

When Deputy Brandau arrived at the Coffins' house, she walked up to the front

door and knocked, but no one answered.[36]  The garage door was up, so she walked over to

the garage and saw Mr. Coffin leaning his head into the garage from the interior door

connecting the garage to the house.[37]  She called to Mr. Coffin from inside the garage,

stating that she wanted to give him some paperwork.[38]  Mr. Coffin shut the interior door.[39]

Deputy Brandau then called a supervisor.[40]  When she was on the call, Mrs. Coffin

walked out into the garage.[41]  From the driveway, where she was on the phone, she

observed Deputy Lutz showing Mrs. Coffin the papers inside the garage.[42]  Deputy

Brandau went into the garage to assist Deputy Lutz and explain to Mrs. Coffin that they

needed to explain the paper work to Mr. Coffin.[43]  Mrs. Coffin denied that he was at

home, and Deputy Brandau interjected that she had seen him lean his head out of the

---

[36]  See docket 30, Depo. Brandau at p. 17.

[37]  See docket 30, Depo. Brandau at pp. 17-18.

[38]  See docket 30, Depo. Brandau at p. 19.

[39]  See docket 30, Depo. Brandau at p. 19.

[40]  See docket 30, Depo. Brandau at p. 20.

[41]  See docket 30, Depo. Brandau at p. 21.

[42]  See docket 30, Depo. Brandau at pp. 22-23.

[43]  See docket 30, Depo. Brandau at pp. 24-25.

interior door.[44]  Deputy Brandau then told Mrs. Coffin that she was obstructing justice.[45]

Deputy Lutz then started to prepare his handcuffs to place them on Mrs. Coffin.[46]  Mrs.

Coffin yelled, "No!" and dropped to the ground.[47]  At that point, Deputy Brandau heard a

noise coming from behind her in the direction of the interior door.[48]  She saw Mr. Coffin

coming toward them.[49]  Mr. Coffin tried to pull Mrs. Coffin away from the deputies, and

Mr. Coffin punched Deputy Brandau in the face and throat area.[50]  The Coffins then

walked back into the house through the interior garage door.[51]

By the time Deputy Brandau walked through the interior door, she saw Deputy

Lutz and the Coffins in the kitchen.[52]  Deputy Brandau told Mr. Coffin to put his hands

behind his back because he was under arrest for battery on a law enforcement officer.[53]

Mr. Coffin yelled at the deputies to get out of his house, and then he punched Deputy

---

[44]   See docket 30, Depo. Brandau at p. 25.

[45]   See docket 30, Depo. Brandau at p. 26.

[46]   See docket 30, Depo. Brandau at p. 27.

[47]   See docket 30, Depo. Brandau at p. 28.

[48]   See docket 30, Depo. Brandau at p. 31.

[49]   See docket 30, Depo. Brandau at p. 31.

[50]   See docket 30, Depo. Brandau at pp. 32-35.

[51]   See docket 30, Depo. Brandau at p. 36.

[52]   See docket 30, Depo. Brandau at p. 37.

[53]   See docket 30, Depo. Brandau at p. 37.

Brandau again.[54]  The blow knocked her down, and while she was on the floor of the

kitchen, she saw Mr. Coffin move toward Deputy Lutz.[55]  She rose and pulled her taser

and told Mr. Coffin to get away from Deputy Lutz.[56]  She then tasered him, and he fell to

the ground.[57]  Mr. Coffin rose and punched Deputy Brandau again before she had time to

reload the taser.[58]  Once Deputy Brandau was able to recover from the blow, she went

into the laundry room where Mr. Coffin and Deputy Lutz were wrestling.[59]  Deputy

Brandau said she did not taser him again, but rather struck Mr. Coffin in the back three or

four times with her asp.[60]  When the asp did not control Mr. Coffin, Deputy Brandau

stunned him again with her taser.[61]  Then Mr. Coffin grabbed her hand that was holding

the taser, pushed it to Deputy Brandau's leg and tasered her.[62]  Deputy Brandau was

pushed into the garage, and she heard the interior door lock with Deputy Lutz and the

---

[54]  See docket 30, Depo. Brandau at p. 43.

[55]  See docket 30, Depo. Brandau at p. 44.

[56]  See docket 30, Depo. Brandau at p. 44.

[57]  See docket 30, Depo. Brandau at p. 45.

[58]  See docket 30, Depo. Brandau at p. 49.

[59]  See docket 30, Depo. Brandau at p. 51.

[60]  See docket 30, Depo. Brandau at p. 52.

[61]  See docket 30, Depo. Brandau at p. 53.

[62]  See docket 30, Depo. Brandau at p. 54.

Coffins inside the house.[63]  When back-up deputies arrived, Deputy Brandau told them they needed to gain entry into the house.[64]  As they were turning the door knob on the interior garage door leading to the kitchen, Deputy Lutz opened that door, holding his gun.[65]  Deputy Brandau holstered Deputy Lutz' gun, and she tended to Deputy Lutz until paramedics arrived.[66]

### Cynthia Coffin

Mrs. Coffin answered the door when Deputy Lutz rang the doorbell.[67]  When Deputy Lutz asked to speak to Mr. Coffin, she told him he would have to wait.[68]  She was waiting for her husband to emerge from the bathroom when through her picture window, she saw Deputy Lutz in the bushes, which frightened her.[69]  She yelled through the window for Deputy Lutz to get off of her property.[70]  At that point, Deputy Lutz said that he saw Mr. Coffin in the living room through the bay window.[71]  From the window, she

---

[63]  See docket 30, Depo. Brandau at p. 62.

[64]  See docket 30, Depo. Brandau at p.61.

[65]  See docket 30, Depo. Brandau at p. 61.

[66]  See docket 30, Depo. Brandau at pp.63-64.

[67]  See docket 31, Depo. C.Coffin at pp. 66-68.

[68]  See docket 31, Depo. C.Coffin at p. 68.

[69]  See docket 31, Depo. C.Coffin at p. 70.

[70]  See docket 31, Depo. C.Coffin at p. 73 & 78-80.

[71]  See docket 31, Depo. C.Coffin at p. 80.

saw Deputy Lutz then move to the front of the garage.[72]  She then went to the garage and opened it.[73]  She saw Deputy Brandau and Deputy Lutz standing at the front of the garage.[74]  She then said she began to close the garage door by pushing the button inside the garage, but Deputy Brandau walked into the garage to trip the lock.[75]  Mrs. Coffin walked into the garage to talk to Deputy Brandau because she felt more comfortable talking to a woman.[76]

Deputy Brandau next told Mrs. Coffin that she was going to arrest her for obstruction.[77]  When Mrs. Coffin turned to go back into the kitchen from the garage, Deputy Brandau grabbed her.[78]  Mrs. Coffin dropped to the floor and the deputies released her.[79]  At that point Mr. Coffin was standing on the stoop inside the garage and Deputy Brandau told him that she was going to taser him and take him to jail.[80]  Mrs. Coffin went inside the kitchen and found Mr. Coffin against the sink being shot with the

---

[72]  See docket 31, Depo. C.Coffin at p. 79.

[73]  See docket 31, Depo. C.Coffin at p. 81.

[74]  See docket 31, Depo. C.Coffin at pp. 82-83.

[75]  See docket 31, Depo. C.Coffin at pp. 83-84.

[76]  See docket 31, Depo. C.Coffin at pp. 88-89.

[77]  See docket 31, Depo. C.Coffin at p. 91.

[78]  See docket 31, Depo. C.Coffin at p. 91.

[79]  See docket 31, Depo. C.Coffin at p. 96.

[80]  See docket 31, Depo. C.Coffin at p. 97.

taser.[81]  A brawl ensued, and Mrs. Coffin ended up being thrown into the laundry room

along with Mr. Coffin and other deputies.[82]  She then saw Deputy Lutz draw and cock his

gun and point it at Mr. Coffin.[83]  Other deputies entered and took the gun away from

Deputy Lutz.[84]  She never saw her husband push Deputy Brandau out the interior garage

door.  Mr. Coffin, who was holding Deputy Brandau's asp, placed it on the kitchen

counter.[85]

## John Coffin

After Mrs. Coffin told her husband that Deputy Lutz was waiting outside, Mr.

Coffin told her to tell him to come back later.[86]  At that point, Mr. Coffin saw Deputy

Lutz through the bay window of his living room.[87]  He heard Mrs. Coffin telling him

through the bay window to get off of their property, and then Mrs. Coffin left the room

headed toward the kitchen and garage.[88]  A few minutes later he heard Mrs. Coffin

---

[81]  See docket 31, Depo. C.Coffin at pp. 99-101.

[82]  See docket 31, Depo. C.Coffin at pp. 98-102.

[83]  See docket 31, Depo. C.Coffin at p. 103.

[84]  See docket 31, Depo. C.Coffin at p. 104.

[85]  See docket 31, Depo. C.Coffin at pp. 104-105.

[86]  See docket 33, Depo. J.Coffin at p. 109.

[87]  See docket 34, Depo. J.Coffin at p. 140.

[88]  See docket 33, Depo. J.Coffin at pp. 123-24, 133-34.

scream.[89]   He went to the garage and saw Mrs. Coffin on the floor with Deputy Lutz and

Deputy Brandau standing over her.[90]   Deputy Brandau told him she would shot him with

the taser and arrest him.[91] After he pulled Mrs. Coffin into the kitchen, "a melee

occurred."[92]   Deputy Brandau shot him with her taser and Deputy Lutz beat him with an

asp.[93]   Mr. Coffin was finally handcuffed by other deputies who had arrived on the

scene.[94]

## ARGUMENT

Plaintiff Cynthia Coffin requests summary judgment for the violation of her Fourth

Amendment right to be free from unreasonable search and seizure based on the entry to

her home without a warrant or exigent circumstances and based on her arrest inside her

house without a warrant or probable cause.  Plaintiff John Coffin seeks summary

judgment on the violation of his Fourth Amendment right based on the entry to his home

 without a warrant or exigent circumstances.  Deputies Brandau and Lutz each seek

summary judgment on the issue of qualified immunity.

---

[89]   See docket 34, Depo. J.Coffin at pp. 137 & 139.

[90]   See docket 34, Depo. J.Coffin at pp. 139-40.

[91]   See docket 34, Depo. J.Coffin at p. 140.

[92]   See docket 34, Depo. J.Coffin at p. 149.

[93]   See docket 34, Depo. J.Coffin at p. 149.

[94]   See docket 34, Depo. J.Coffin at p. 150.

## QUALIFIED IMMUNITY

Public officials, such as these deputies, acting in the course and scope of their employment are shielded from suit against them in their individual capacities if while performing discretionary acts, they commit torts and any such torts do not violate a clearly established statutory or constitutional right.  Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).  All parties agree in this case that the deputies were engaged in their discretionary duties when they arrived at the Coffins to serve an injunction on Mr. Coffin.  Before answering the question of whether a clearly established law was violated, the district court must first analyze whether, viewing the facts in the light most favorable to the party asserting the injury, a constitutional or statutory right was violated.  See Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 2156, 150 L.Ed.2d 272 (2001); McClish v. Nugent, 483 F.3d 1231, 1237-38 (11th Cir. 2007) (holding that qualified immunity inquiry must not assume that constitutional violation was committed, but rather must decide whether Fourth Amendment rights were violated in each specific case).

## ANALYSIS

Both Deputy Brandau and Deputy Lutz entered the garage of the Coffins' home without a warrant.  If the attached garage constitutes part of the home, as this Court finds it does, then absent consent, exigent circumstances, or some other exception to the warrant requirement, the warrantless entry of the home was invalid, and Mrs. Coffin's arrest that ensued was illegal.  See Bates v. Harvey, 518 F.3d 1233, 1243 (11th Cir. 2008)

-14-

(citing <u>Katz v. United States</u>, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576

(1967)).  Although only Mrs. Coffin contests her arrest, both Mr. and Mrs. Coffin claim

that the initial entry was illegal.  In keeping with the proper order of analysis in qualified

immunity cases, this Court will first consider whether the deputies violated federal or

state law before considering whether that law was clearly established at the time of the

violation.  <u>McClish</u>, 483 F.3d at 1237-38.

**Were the Coffins' Fourth Amendment Rights Violated by Entering the Garage?**

The most fundamental protection afforded by the Fourth Amendment is the right to

the privacy and security of our own homes.  <u>See</u> <u>Wilson v. Layne</u>, 526 U.S. 603, 610, 119

S.Ct. 1692, 1697, 143 L.Ed.2d 818 (1999).  The necessity of obtaining a warrant

minimizes the danger of "physical entry of the home."  <u>Bates</u>, 518 F.3d at 1243 (quoting

<u>Payton v. New York</u>, 445 U.S. 573, 585-86, 100 S.Ct. 1371, 1379-80, 63 L.Ed.2d 639

(1980)).  The Supreme Court has stated that "the rule in <u>Payton</u> was designed to protect

the physical integrity of the home."  <u>New York v. Harris</u>, 495 U.S. 14, 17 110 S.Ct. 1640,

1643, 62 L.Ed.2d 275 (1979).

<u>*Entry into the Garage*</u>

The first question that must be answered is whether entering the garage constituted

entering the Coffins' home.  If the garage is considered part of the home, then absent any

exception, a warrant was required to enter the Coffins' home.  In Florida, one's "home"

afforded protection by the Fourth Amendment includes the curtilage surrounding the

house.  <u>See</u> <u>State v. Rickard</u>, 420 So.2d 303, 306-07 (Fla. 1982) (holding that backyard

-15-

was part of "home" protected from unreasonable searches and seizures because

homeowner demonstrated expectation of privacy in backyard by erecting partition and

chain link fence).  Apart from Florida's case law, the Supreme Court has provided

guidance to ascertain what areas should be included in the curtilage of the dwelling place

and therefore the protection of the Fourth Amendment.  See United States v. Dunn, 480

U.S. 294, 301, 107 S.Ct. 1134, 1139-40, 94 L.Ed.2d 326 (1987).  The following four

factors should be considered: 1) the proximity of the area claimed to be curtilage; 2)

whether the area is included in an enclosure surrounding the home; 3) the nature of the

uses in the claimed area; and 4) the measures taken by the resident to ensure the inability

of passersby to observe the area.  Dunn, 480 U.S. at 301, 107 S.Ct. at 1139.  The issue is

"whether the area in question is so intimately tied to the home itself that it should be

placed under the home's 'umbrella' of Fourth Amendment protection."  Id.

The Coffins' garage is attached to the house itself, and it holds their cars,

motorcycles, and other household items that are typically kept in a garage.[95]  Unless the

garage door is up, no passersby can see into the garage.  Under the rationale of Dunn, the

Coffins treated the garage as part of their home, and certainly its location and

construction as an attachment to the house with an interior door into the kitchen could not

be considered anything other than part of the dwelling unit.  For all intents and purposes,

---

[95]  See docket 31, Depo. C.Coffin at p. 109.

the Coffins' garage is unequivocally part of their dwelling unit with the expectation of privacy afforded one's home.

Accepting all of the parties' testimony as true, when Mrs. Coffin pushed the button inside the garage to close the automatic garage door, Deputy Brandau blocked the beam so that the garage door returned to the open position and would not close.  The testimony is also clear that both deputies came into garage through the open garage door without an invitation from either of the Coffins.  Thus, the deputies' entry into the Coffins' garage constituted an illegal warrantless entry absent any exception to the warrant requirement.  Both consent and exigent circumstances were posited by the deputies as applicable exceptions to the warrant requirement in this case.

*Consent Exception*

When the government invokes an exception to the warrant requirement, a rebuttable presumption is created to make the entry unreasonable.  See Riggs v. State, 918 So.2d 274, 278-79 (Fla. 2005) (citing Supreme Court precedent).  The deputies maintain that Mrs. Coffin consented to their entry into the garage,[96] relying on Byrd v. State, 481 So.2d 468 (Fla. 1985), and Gasset v. State, 490 So.2d 97 (Fla.Dist.Ct.App. 1986).  Gasset is vastly different from the present case involving the Coffins, however.  In Gasset, Mr. Gasset was driving erratically and over eighty miles per hour, refusing to stop.  He

---

[96]   Consent to the warrantless entry is an exception to the warrant requirement. Bates, 518 F.3d at 1243 (citing Illinois v. Rodriguez, 497 U.S. 177, 181, 110 S.Ct. 2793, 2797, 111 L.Ed.2d 148 (1990)).

headed to his home and into his attached garage to elude capture, but the police entered the garage to effectuate an arrest.  Mr. Gasset's situation was akin to a high speed chase, in which he was endangering himself, the deputies, and the public, for which the court held he waived any expectation of privacy he may have possessed in his garage.

The deputies rely on language in <u>Byrd</u> that deems consensual entry that which is not forced or deceptive.  <u>Byrd</u>, 481 So.2d at 472.  In <u>Byrd</u>, however, an important factor considered by the court was the arrestee's prior knowledge of the officer who was asking admission.  Additional actions of consent taken by the arrestee included opening the door and stepping back so that the officer could enter.

In the instant case, neither Mrs. Coffin, nor Mr. Coffin, ever consented to the deputies entering into the garage.  Both deputies walked into the garage uninvited.  Mrs. Coffin attempted to shut the automatic garage door by pushing the button, but Deputy Brandau prevented the door from closing by blocking the beam.  Neither deputy asked Mrs. or Mr. Coffin if they could enter the garage.  The discussion simply began in the garage when Deputy Brandau told Mrs. Coffin she was going to arrested her for obstruction.  Although Mrs. Coffin testified that she initially felt that she could approach Deputy Brandau because she was a woman, she quickly changed her mind when arrest was threatened.  Neither of the Coffins ever left their home, and thus, no "threshold" issue ever arose.  Unlike <u>Gasset</u>, a chase, or pursuit, never occurred.  The situation at hand involved service of legal process, and neither of the Coffins consented to either deputy

entering their home.  The entry into the garage was nonconsensual, and the Coffins'

consent was not obtained at any time thereafter.

*Exigent Circumstances Exception*

A second exception to the warrantless search is the existence of exigent

circumstances.  Bates, 518 F.3d at 1243 (citing Brigham City, Utah v. Stuart, 547 U.S.

398, 403, 126 S.Ct. 1943, 1947, 164 L.Ed.2d 650 (2006)).  This exception is premised on

the concept that "a warrantless entry by criminal law enforcement officials may be legal

when there is compelling need for official action and no time to secure a warrant." Bates,

518 F.3d at 1245 (quoting Michigan v. Tyler, 436 U.S. 499, 509, 98 S.Ct. 1942, 1949, 56

L.Ed.2d 486 (1978)).   Based on the evidence in the file, there is no indication that any

person was in imminent physical danger or that an emergency situation existed at the time

the deputies entered the Coffins' garage.  No circumstances prevented the deputies from

obtaining a warrant should they have desired to obtain one for obstruction.  There is

simply no testimony supporting a finding of exigent circumstances at the time the

deputies entered the garage in this case.

**Was the law regarding entry of the garage clearly established?**

Having determined that the entry to the garage violated a constitutional right of the

Coffins, the next question to consider under qualified immunity is whether the law was

clearly established on April 18, 2006, the date of the violation.  The appropriate inquiry is

whether the law provided Deputy Brandau and Deputy Lutz with "fair warning" that their

conduct violated the Fourth Amendment.  See Hope v. Pelzer, 536 U.S. 730, 741, 122

S.Ct. 2508, 153 L.Ed.2d 666 (2002).  For the following reasons, the Court finds that it did not.

_Pre-Existing Clearly Established Law_

The Court finds that without the benefit of <u>McClish v. Nugent</u>, 483 F.3d 1231 (11th Cir. 2007), which was decided on April 11, 2007, almost one year after the incident, the deputies could not have known whether entering the garage without a warrant was clearly a violation of the Coffins' constitutional rights.  In <u>McClish</u>, the deputy pulled McClish through the open front door of his home to effectuate a warrantless arrest.  Although the Eleventh Circuit found that the deputy had violated McClish's Fourth Amendment rights by reaching across the threshold of his home and pulling him out to make an arrest, the deputy had not received "fair warning" that those actions would have constituted a violation.  The Eleventh Circuit held that the question of whether <u>Payton</u> or <u>Santana</u>[97] applies to the arrest of a person "who, while standing firmly inside the house, opens the door in response to a knock from the police and is then pulled outside the unambiguous physical dimensions of the home" had not been resolved at the time of the violation by any Supreme Court, Eleventh Circuit, or Florida Supreme Court case.

Granted, a factually identical case is not required for fair notice.  <u>McClish</u>, 483 F.3d at 1248.  To the extent that the conduct is not clearly unlawful in light of pre-existing law, the deputies are entitled to qualified immunity.  Here, Mrs. Coffin had

---

[97]   <u>United States v. Santana</u>, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976).

-20-

already answered the front door for Deputy Lutz and knew that he was trying to serve an injunction on her husband, Mr. Coffin. She had not told the deputy to leave. When the two deputies walked into the already open garage, Mrs. Coffin admitted that she decided to approach Deputy Brandau because she felt comfortable talking to a woman. Mrs. Coffin saw Deputy Lutz in the garage at the same time. The deputies knew that Mr. Coffin was at home, and in fact, he also entered the garage. Having at least arguable probable cause to believe that Mrs. Coffin was obstructing service of legal process pursuant to Florida law,[98] Deputy Brandau began to effectuate the arrest.

McClish acknowledged the flux in the state of the law with respect to arrests at or just within the threshold of the house, particularly under Florida case law. While reiterating the "firm line" of Payton that prohibits warrantless arrests inside one's home absent exception to the warrant requirement, the McClish court still granted qualified immunity to the deputy based on the absence of case law covering the particular circumstances of that case. Under the facts of this case, as in McClish, there was no clearly established law that would warn the deputies that they were committing constitutional violations by entering the open garage on April 18, 2006.

It is therefore **ORDERED AND ADJUDGED** as follows:

(1)     Plaintiffs' Motion for Summary Judgment (Dkt. 43) is **DENIED**.

---

[98]   See Fla. Stat. § 843.02

(2)      Defendant Stacy Brandau's Motion for Summary Judgment (Dkt. 49) is

**GRANTED**.

(3)      Defendant James Lutz' Motion for Summary Judgment (Dkt. 53) is

**GRANTED.**

(4)      The Clerk is directed to enter judgment in favor of Defendants on all

counts.

(5)      The Clerk is directed to close this case.

**DONE AND ORDERED** at Tampa, Florida, on July 31, 2008.


_____s/*Richard A. Lazzara*_____
**RICHARD A. LAZZARA**
**UNITED STATES DISTRICT JUDGE**


<u>COPIES FURNISHED TO</u>:
Counsel of Record