# United States Court of Appeals
## For the Eleventh Circuit

No. 08-14538

District Court Docket No.
07-00835-CV-T-26-TBM

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

Jun 3, 2011

JOHN LEY
CLERK

JOHN COFFIN,
CYNTHIA COFFIN,

Plaintiffs-Appellants,

versus

STACY BRANDAU,
individually,
f.k.a. Stacy Ferris,
JAMES LUTZ,
individually,

Defendants-Appellees.

A True Copy, Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit

By:
Deputy Clerk
Atlanta, Georgia

-----------------------------------------------------------
Appeal from the United States District Court
for the Middle District of Florida
-----------------------------------------------------------

## JUDGMENT

It is hereby ordered, adjudged, and decreed that the attached opinion included herein by reference, is entered as the judgment of this Court.

ISSUED AS MANDATE
JUL 0 6 2011
U.S. COURT OF APPEALS
ATLANTA GA

Entered:      June 3, 2011
For the Court:   John Ley, Clerk
By:      Patch, Jeffrey

[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

```
                          FILED
                  U.S. COURT OF APPEALS
                    ELEVENTH CIRCUIT
     No. 08-14538          JUNE 3, 2011
                         JOHN LEY
                          CLERK
```

D. C. Docket No. 07-00835-CV-T-26-TBM

JOHN COFFIN,
CYNTHIA COFFIN,

Plaintiffs-Appellants,

versus

STACY BRANDAU,
individually,
f.k.a. Stacy Ferris,
JAMES LUTZ,
individually,

Defendants-Appellees.

Appeal from the United States District Court
for the Middle District of Florida

(June 3, 2011)

Before DUBINA, Chief Judge, TJOFLAT, EDMONDSON, CARNES, BARKETT,
HULL, MARCUS, WILSON, PRYOR, MARTIN, ANDERSON, and BLACK.

ANDERSON, Circuit Judge:

In this case, Cynthia Coffin attempted to shut her open garage door to prevent two Sarasota County Sheriff's deputies, James Lutz and Stacy Brandau, from serving a court order on her husband, John Coffin.[1]  As Ms. Coffin attempted to close the open garage door, Brandau stepped into the threshold, breaking the electronic-eye safety beam on the garage door and causing the door to retreat to its open position.  The Deputies, who did not possess either a search warrant or an arrest warrant, entered the Coffins' attached open garage and arrested Ms. Coffin for obstruction of justice.  The Coffins then sought damages against Lutz and Brandau under 42 U.S.C. § 1983 on the grounds that the Deputies' warrantless entry into their garage and Ms. Coffin's arrest violated their Fourth Amendment rights.

The Deputies argued that qualified immunity shielded them from liability. Respecting the only two claims before the court—Ms. Coffin's challenge to her arrest and both Plaintiffs' challenge to the Deputies' entry into the garage—the district court granted summary judgment to the Deputies.  The district court

---

[1] For convenience, we sometimes refer to Lutz and Brandau collectively, as "the Deputies."

2

concluded that, although the Deputies violated the Coffins' Fourth Amendment rights by entering the garage, that right was not clearly established.  And because there was at least arguable probable cause to arrest Ms. Coffin for obstructing service of legal process, the Deputies were entitled to qualified immunity on both Ms. Coffins' arrest claim and on the Plaintiffs' challenge to the entry into the garage.  On initial appeal, we affirmed.  Coffin v. Brandau, 609 F.3d 1204 (11th Cir. 2010).

This court then vacated that decision and granted rehearing en banc to address whether the warrantless seizure of Ms. Coffin inside her garage by Deputies Brandau and Lutz violated the Coffins' Fourth Amendment rights and, if so, whether those rights were clearly established when this incident occurred, such that the Deputies should be stripped of qualified immunity.  Coffin v. Brandau, 614 F.3d 1240 (11th Cir. 2010).  We hold that although the Deputies' entrance into the garage did violate the Coffins' Fourth Amendment rights, the boundaries of the right violated here were not clearly established and, thus, the Deputies are entitled to qualified immunity.  Accordingly, the district court properly granted summary judgment in favor of the Deputies both on Ms. Coffin's arrest claim and on the Plaintiffs' challenge to the entrance of the garage.

I. Facts

3

Deputy Lutz arrived at the Coffins' home on April 18, 2006, shortly before 6:30 PM, during daylight hours. Lutz was there to serve Mr. Coffin with an Order of Temporary Injunction Against Repeat Violence, which Mr. Coffin's tenant had obtained six days earlier from the Circuit Court for Charlotte County, Florida.[2] The injunction required Mr. Coffin to surrender any firearms or ammunition in his possession to the Sarasota County Sheriff and ordered "[t]he Sheriff of Sarasota County, or any other authorized law enforcement officer . . . to serve this temporary injunction upon Respondent as soon as possible after its issuance."

The Coffins' home faces the street and is in close proximity to the sidewalk. The attached garage also faces the street and was fully open at the time Deputy Lutz arrived, exposing its interior. The driveway leads directly from the street to the garage, and a pathway veers left from the driveway up to the front door. Between the front door and the garage, the house has a large front bay window which had its curtains drawn open at the time Lutz arrived.

Upon his arrival, Lutz approached the Coffins' front door and rang the bell. Cynthia Coffin answered the door and Lutz explained that he had papers to deliver

---

[2] The injunction had been issued by the Circuit Court of Charlotte County, pursuant to Fla. Stat. Ann. § 784.046 (West 2011). Section 784.046 allows a petitioner to obtain an "injunction for protection in cases of repeat violence" after "two incidents of violence or stalking [are] committed by the respondent, one of which must have been within 6 months of filing of the petition, which are directed against the petitioner or [an] immediate family member. Fla. Stat. Ann. § 784.046(1)(b), (2).

4

to Mr. Coffin.[3]   Ms. Coffin responded that Mr. Coffin was in the bathroom and Lutz would have to wait.   She then shut and locked the front door.   After waiting a few minutes, Lutz walked back down the pathway facing the front bay window and, believing he had made eye contact with Ms. Coffin through the window, waved the paperwork above his head as a reminder that he was waiting.   Under the impression that Ms. Coffin had seen him, Lutz walked back up to the front door expecting her to open it and give him an update.   As he approached the front door, he overheard a man's voice asking, "What did he want?"   Lutz then either rang the bell or knocked on the front door for a second time but received no answer.   He then walked up to the front window to try to get the Coffins' attention.   Ms. Coffin, upset that Lutz was walking through her bushes, began shouting for him to get out of her bushes and off her property and threatened to call the police.   Lutz backed up from the window and walked over to his patrol car, parked on the street at the driveway, in order to call for backup because he felt the Coffins were trying to avoid service and there was a possibility of obstruction.

About five to eight minutes after calling for backup, Deputy Brandau arrived at the scene.   Around the time of Brandau's arrival, Lutz saw a man that he

---

[3] It is undisputed that Lutz did not know that the woman who opened the door was Ms. Coffin at the moment she opened the door but that events following this made her identity clear to him.

5

assumed was Mr. Coffin through the front window.[4]  Brandau was on the phone

with her supervisor while Lutz was apprising her of the situation at the Coffin

house.

According to Lutz, the Deputies were standing in front of the open garage

door while Brandau was talking on the phone with a supervisor about what to do

next when they heard the interior garage door open and close and the rolling garage

door start to close.  Brandau interrupted the phone call, and walked into the open

garage, tripping the electronic sensor and causing the garage door to retreat to its

open position.  Lutz followed, and saw Brandau go and knock on the interior door

from the garage to the kitchen, whereupon Ms. Coffin came out into the garage and

yelled at both Deputies to get off her property.  Brandau announced to Ms. Coffin

an intention to arrest her for obstructing service of process.

According to Ms. Coffin, she opened the door from the kitchen to the garage,

reached out and pushed the automatic button to close the garage door, at which

time she saw Brandau followed by Lutz walk into the garage and trip the electronic

sensor causing the garage door to return to its open position.  She then walked into

---

[4] The paperwork to be served contained a description of Mr. Coffin that the man inside
appeared to fit.

6

the garage to talk with Brandau, feeling more comfortable talking to a female.[5]

The parties agree that the Deputies attempted to arrest Ms. Coffin for obstruction of service of process and that a struggle ensued as the Deputies attempted to handcuff Ms. Coffin. The struggle began between the Deputies and Ms. Coffin in the garage, and when Mr. Coffin intervened included both Deputies and both Coffins and expanded from the garage to the house.[6] Additional deputies arrived and both Mr. and Ms. Coffin were ultimately arrested.[7]

---

[5] To the extent the versions in the preceding two paragraphs differ, the differences are not material.

[6] The Coffins present only two claims on appeal, and the details of the struggle are not relevant to either claim. It is clear that appellants' only challenges on this appeal are: 1) whether the Deputies' initial entry into the open garage as the door was shutting violated appellants' Fourth Amendment rights; and 2) whether the arrest of Ms. Coffin violated her Fourth Amendment rights. Because the Fourth Amendment consequences of the Deputies' entry into the open garage depend upon Plaintiffs' expectation of privacy, the facts of the subsequent struggle in the garage and house are not relevant. Similarly the Fourth Amendment consequences of the arrest depend upon probable cause, arguable probable cause, and/or the fruit of any illegal entry into the garage. Again the details of the subsequent struggle are not relevant. Thus, the dissent's extensive recitation of appellants' version of the struggle in the garage and in the house is not relevant to the legal issues on appeal. See Barkett, J., concurring in part and dissenting in part, infra at 3–5 (hereinafter "Dissenting Op.").

If the Deputies here were bad, as the Plaintiffs' version of the facts of the struggle suggest, those bad, but irrelevant, facts should not lead us to an inaccurate application of precedent.

[7] Ms. Coffin was charged with the misdemeanor of obstruction of justice without violence under Fla. Stat. Ann. § 843.02. Mr. Coffin was charged with several felonies: two counts of battery on a law enforcement officer under Fla. Stat. Ann. § 784.07(2)(b) and § 784.03(1); resisting an officer with violence under Fla. Stat. Ann. § 843.01; two counts of use of a weapon on a law enforcement officer under Fla. Stat. Ann. § 790.054; and depriving an officer of means of protection or communication under Fla. Stat. Ann. § 843.025. Because the Deputies lacked a warrant for Mr. Coffin's arrest, these charges, with the exception of the § 843.025 charge, were

We are no longer required to follow the two-step process once mandated by Saucier v. Katz, 533 U.S. 194, 121 S. Ct. 2151 (2001). Thus, we are free to address the question of whether the facts that the plaintiff alleged showed a violation of a constitutional right or the question of whether the right at issue was clearly established in the order most appropriate for the case at hand.

As noted, the Coffins present only two claims. Both Coffins challenge the Deputies' entry into the garage; only Ms. Coffin challenges her arrest.[8] We address first Ms. Coffin's claim for an unlawful arrest. Then we address whether the entry into the garage violated the Coffin's Fourth Amendment rights. Because we conclude that the entry did violate Fourth Amendment rights, we address finally whether there was a violation of clearly established Fourth Amendment law.

II. Ms. Coffin's Claim for Unlawful Arrest

Deputies are entitled to qualified immunity on claims of false arrest so long as they had probable cause or arguable probable cause for the arrest. See Lee v. Ferraro, 284 F.3d 1188, 1195 (11th Cir. 2002). We easily conclude that the Deputies had ample probable cause to arrest Ms. Coffin for misdemeanor

---

dropped. On March 13, 2007, Mr. Coffin pled no contest to that charge and was sentenced to six days' confinement. Meanwhile, the § 843.02 charge against Ms. Coffin was dismissed.

[8] The Coffins do not challenge the arrest of Mr. Coffin, and do not challenge the Deputies' entry into the home itself.

obstruction of justice. At the very least, they had arguable probable cause for arrest, which is all that is required for qualified immunity purposes. Id. at 1195. The difficulty with the arrest in this case turns not on the probable cause question, but on the question of whether the officers were entitled to enter the garage in order to make that warrantless arrest. See Minnesota v. Olson, 495 U.S. 91, 95, 110 S. Ct. 1684, 1687 (1990) ("It was held in Payton v. New York that a suspect should not be arrested in his house without an arrest warrant, even though there is probable cause to arrest him.") (citation omitted); United States v. Edmondson, 791 F.2d 1512, 1515 (11th Cir. 1986) ("A finding of probable cause alone . . . does not justify a warrantless arrest at a suspect's home."). For the reasons discussed below, we hold that it was not clearly established that the garage entry here would violate the Fourth Amendment, and because the Deputies had probable cause to arrest Ms. Coffin for obstruction, they are entitled to qualified immunity on this claim.

Probable cause to arrest exists under both federal and Florida law when an arrest is "objectively reasonable based on the totality of the circumstances." Lee, 284 F.3d at 1195. "This standard is met when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an

9

offense." Id. (citations and quotations omitted). Probable cause requires more than a mere suspicion, but not the level of convincing proof necessary to support a conviction. Id. Arguable probable cause exists where reasonable officers in the same circumstances and with the same knowledge as the defendant could have believed that probable cause existed. Id.

Florida provides for service of process to be made only on the person to be served, their spouse, or a person above the age of fifteen living with respondent.[9] Florida statutory law provides no other methods for serving an individual; unlike some states, Florida statutes do not provide for proper service of process to be made by affixing a copy to the door of the residence and following up with a mailed copy. Compare Fla. Stat. Ann. § 48.031 (West 2011) with N.Y. C.P.L.R. § 308 (McKinney 2010) (providing for "nail and mail" service and for service "in such manner as the court, upon motion without notice, directs, if service is impracticable under paragraphs one, two and four of this section").

Under Florida law, a person has the legal obligation to accept service of process when service is attempted reasonably. See Haney v. Olin Corp., 245 So. 2d

---

[9] Fla. Stat. Ann. § 48.031(1)(a) provides that "[s]ervice of original process is made by delivering a copy of it to the person to be served . . . or by leaving the copies at his or her usual place of abode with any person residing therein who is 15 years of age or older and informing the person of their contents." Fla. Stat. Ann. § 48.031(2)(a) then provides that "[s]ubstitute service may be made on the spouse of the person to be served . . . , if the cause of action is not an adversary proceeding between the spouse and the person to be served."

671, 673 (Fla. 4th DCA 1971) ("An officer's reasonable attempt to effect personal service of process upon a person in his own home, when the person reasonably should know the officer's identity and purpose, cannot be frustrated by the simple expedient of the person closing the front door in the officer's face and wilfully refusing to accept service of process.").  While there are some Florida cases that have indicated that courts will accept less than personal service in the event that people attempt to avoid service, the law in this area is quite sparse and certainly could not clearly establish under what circumstances a lesser method of service is acceptable.  See, e.g., Haney, 245 So. 2d at 672–74 (holding that, where deputy sheriff observed husband standing in doorway and wife fled back to the home's front door yelling "no" and closed the door after sheriff identified himself as present to serve process, deputy sheriff's actions of identifying himself in a loud voice, announcing he had copies of summons, reading them loudly outside the door, and announcing he was leaving them on the doorstep was sufficient delivery of papers to effect valid service of process); Liberman v. Commercial Nat'l Bank of Broward Cnty., 256 So. 2d 63, 63–64 (Fla. 4th DCA 1971) (holding that personal service was perfected on defendant where deputy sheriff observed the defendant retrieve papers left in his mail box after attempting to avoid service by running away from process server into his home but noting that "this approaches outer

11

limits").

Lutz, a fully uniformed Sarasota Sheriff's deputy arrived at the Coffins' house with a validly executed restraining order and temporary injunction against repeat violence, which under Florida law is somewhat different from an ordinary summons and complaint. He testified in his deposition that restraining orders must be served on the person named therein and that he had never simply left a restraining order at a residence or performed substitute service on a different person present at the residence.

The notion that serving a restraining order should be treated differently than serving ordinary process finds some support both in Florida's procedural rules and in the language used in Section 784.046. With regard to restraining orders in actions by victims of repeat violence, the relevant Florida procedural rules provide that there must be personal service and that service can be made only by a law enforcement officer. See Fla. R. Fam. Law R. Proc. 12.610(b)(2)(B) (with respect to a petition for repeat violence "[p]ersonal service by a law enforcement agency is required"); see also Fla. R. Fam. Law. R. Proc. 12.160(c)(3)(A) ("A temporary injunction for protection against . . . repeat violence . . . *must be personally served.*") (emphasis added). By contrast, service of other documents need not be served by a law enforcement officer. See Fla. Stat. Ann. § 48.021 (outlining the

12

general guidelines for who may serve process).[10]  Section 784.046 also provides,

with respect to restraining orders concerning repeat violence, that after the clerk of

court furnishes a copy of the documents to a law enforcement officer, the officer

*"shall serve it upon the respondent as soon thereafter as possible on any day of the*

*week and at any time of the day or night."*  Fla. Stat. Ann. § 784.046(8)(a)(1)

(emphasis added).  The few Florida cases that allowed for some alternative form of

service involved delivery of a standard summons and complaint, and not a repeat

violence petition and restraining order that required the securing of firearms.[11]

In Lutz's first interaction with Ms. Coffin, at the front door of the Coffin

home, Lutz clearly stated his legitimate reason for being on their property – to

serve Mr. Coffin with this restraining order.  At that time, Ms. Coffin

---

[10] Also by contrast, Florida statutes allow for substitute service of other types of documents.  See Fla. Stat. Ann. § 48.031 (outlining general guidelines for how to serve process).  It is not clear that substitute service is sufficient for proper service of a restraining order in an action by a victim of repeat violence.

[11] The dissent states that there is no support in the Florida law that a restraining order for repeat violence is treated differently from a standard summons and complaint and cites two decisions of an intermediate court of appeal for the notion that general service-of-process law applies to service of a temporary restraining order.  See Dissenting Op. at 3.  The cases cited did not involve a restraining order for repeat violence.  See Top Dollar Pawn Too, Inc. v. King, 861 So. 2d 1264, 1266 (Fla. 4th DCA 2003); Palamara v. World Class Yachts, Inc., 824 So. 2d 194, 195 (Fla. 4th DCA 2002) (per curiam).  The dissent both overlooks clear language of the Florida procedural rules (indicating that repeat violence petitions must be personally served by a law enforcement officer) and fails to recognize that, as decisions of an intermediate state court, the cases it cites—which incidentally are not on point—could not clearly establish that the general service of process law applies to service of a restraining order against repeat violence in any event.

13

unequivocally indicated that Mr. Coffin was home but that Lutz would have to wait. After waiting a few minutes, with no contact from either of the Coffins, Lutz tried to get Ms. Coffin's attention through the front window, assuming this would prompt her to offer an update. Ms. Coffin, aware that Lutz had paperwork that he had described as important, then began yelling at Lutz through the front window to get out of her bushes and off her property. And her attempt to close the garage door appeared to the Deputies as a further effort to avoid service.

It reasonably appeared to the Deputies that Ms. Coffin tried to thwart the Deputies' ability to serve process on Mr. Coffin, and, thus, they had probable cause to arrest her for obstruction of justice, setting aside for the moment any Fourth Amendment implications arising from the Deputies' entry into the garage, as noted in the next paragraph.[12]  Obstruction of service of process is a misdemeanor offense. Fla. Stat. Ann. § 843.02.[13]  The obstruction occurred in the presence of the

---

[12] The dissent properly points out that the occupants of a house are free to deny an officer's request to enter their home, and are free to talk to the officers through a closed door. Dissenting Op. at 2 n.2 (citing Kentucky v. King, 536 U.S. ___, slip op. at 16 (May 16, 2011); United States v. Tobin, 923 F.2d 1506, 1512 (11th Cir. 1991) (en banc)). However, the dissent overlooks the fact that the Deputies here did not enter the home; rather, they entered an open garage to access and knock on the visible door to the kitchen.

[13] Fla. Stat. Ann. § 843.02 provides: "Whoever shall resist, obstruct, or oppose any officer . . . personnel or representative of the Department of Law Enforcement; or other person legally authorized to execute process in the execution of legal process or in the lawful execution of any legal duty, without offering or doing violence to the person of the officer, shall be guilty of a misdemeanor of the first degree, punishable as provided in 775.082 or 775.083."

officers, and they were thus authorized to make an arrest without a warrant, immediately or in fresh pursuit. Fla. Stat. Ann. § 901.15 & (1) ("A law enforcement officer may arrest a person without a warrant when [t]he person has committed a felony or misdemeanor or violated a municipal or county ordinance in the presence of the officer. An arrest for the commission of a misdemeanor or the violation of a municipal or county ordinance shall be made immediately or in fresh pursuit.").

For the reasons discussed below in Part IV of this opinion, although the Deputies' entry into the Coffins' garage violated their Fourth Amendment rights, there was not a violation of clearly established law. Thus, the Deputies are entitled to qualified immunity with respect to the entry and the entry does not deprive the Deputies of qualified immunity for the otherwise lawful arrest of Ms. Coffin.

## III. Entry of the Garage; the Fourth Amendment is Violated

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." Payton v. New York, 445 U.S. 573, 585, 100 S. Ct. 1371, 1379–80 (1980) (citation and quotations omitted); Riggs v. State, 918 So. 2d 274, 277 (Fla. 2005) (quoting Payton). Never

15

is the Fourth Amendment "zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home." Payton, 445 U.S. at 589, 100 S. Ct. at 1381–82.

The Coffins argued both in the district court and on appeal that their open adjacent garage was part of "the unambiguous physical dimensions" of their home and, therefore, was entitled to the absolute protection of a home under Payton. The difficulty with this argument is that, while the garage here is attached, is covered by a compatible hip roof, and does share one common wall with the house, it is different from the living areas of the home that are easily categorized as part of the "unambiguous physical dimensions" of the home. The garage has a very large exterior door facing the street that was left fully raised, thus exposing the interior to any neighbors or passersby. The garage was not open only momentarily in order for a car to enter; it was open from before the Deputies arrived until the moment Ms. Coffin attempted to close it. In contrast with the abundance of case law reiterating the high level of Fourth Amendment protection afforded a home, case law addressing the Fourth Amendment status of an attached but open garage is quite sparse, not only in Florida but throughout the country.

The Coffins rely primarily on Payton, its predecessors, and progeny for their argument that the Deputies violated the Fourth Amendment when they entered the

16

garage. The cases they cite, for example, <u>Kirk v. Louisiana</u>, 536 U.S. 635, 122 S.

Ct. 2458 (2002), <u>Oliver v. United States</u>, 466 U.S. 170, 104 S. Ct. 1735 (1984), and

<u>Silverman v. United States</u>, 365 U.S. 505, 81 S. Ct. 679 (1961), all reiterate the

principle that homes are entitled to the greatest Fourth Amendment protection. <u>See</u>

<u>Kirk</u>, 536 U.S. at 638, 122 S. Ct. at 2459 ("As <u>Payton</u> makes plain, police officers

need either a warrant or probable cause plus exigent circumstances in order to

make a lawful entry into a home."); <u>Oliver</u>, 466 U.S. at 178, 104 S. Ct. at 1741

("[T]he Court since the enactment of the Fourth Amendment has stressed the

overriding respect for the sanctity of the home that has been embedded in our

traditions since the origins of the Republic.") (citation and quotations omitted);

<u>Silverman</u>, 365 U.S. at 511, 81 S. Ct. at 683 ("At the very core [of the Fourth

Amendment] stands the right of a man to retreat into his own home and there be

free from unreasonable governmental intrusion."). These cases, however, do not

address the crucial question in this case, which is whether an open attached garage

is entitled to the same level of protection. Despite the dissent's repeated insistence,

<u>Payton</u> simply did not involve a garage at all. Thus, <u>Payton</u> made no holding with

respect to whether an attached open garage is part of the home.

Both the United States Supreme Court and our Court have, in some

circumstances, extended Fourth Amendment protection to garages, <u>see</u> <u>Taylor v.</u>

17

United States, 286 U.S. 1, 52 S. Ct. 466 (1932); United States v. Sokolow, 450 F.2d 324 (5th Cir. 1971) (per curiam); Kauz v. United States, 95 F.2d 473 (5th Cir. 1938).   However, these cases are distinguishable from the instant case and, therefore, do not control our outcome today.

In Taylor v. United States, the Supreme Court held that whiskey recovered by officers from a closed and locked garage should have been suppressed as the product of an unreasonable search.  286 U.S. at 5–6, 52 S. Ct. at 467.  The officers, after smelling whisky emanating from the garage and seeing a number of cardboard boxes that appeared to contain jars of liquor by peering through a small opening, "broke the fastening upon a door," forcibly entering the once locked garage.  Id. at 5, 52 S. Ct. at 467.  Taylor thus holds that a garage is entitled to Fourth Amendment protection when it is closed and locked, maintaining the owner's expectation of privacy, but says nothing about an open garage.

Likewise, Sokolow, which also extended Fourth Amendment protection to a garage cannot control the outcome of this case.  In Sokolow, a police officer followed a car suspected to contain stolen cigarettes to the Sokolow residence where the car "backed up to Sokolow's garage." 450 F.2d at 325.  "While arresting the suspect, the officer saw a number of air conditioning units stacked in the garage." Id.  The officer then entered the garage and recorded serial numbers from

18

the air conditioning units without a search warrant. Id. The facts of Sokolow do not make clear whether the garage door was open or whether the officer could see into the closed garage through a window. See id.

The fact that the Coffins' garage was left open for an indefinite period of time is a crucial fact in this case. Sokolow, with its cursory statement of facts, is wholly insufficient to control our analysis here. Further, the garage in Sokolow, even if open, did not have a visible passageway from the outer threshold of the garage through to an interior access door of the home, and the officer did not enter to use such a pathway in order to knock on the interior door and make contact with the homeowner, as the Deputies did here. See id.[14]

Finally, Kauz does not control. In Kauz, two officers were patrolling a neighborhood and noticed a car known to be a "liquor car" in front of a garage "which was open about three feet." Kauz, 95 F.2d at 473–74. The officers then witnessed Butler, one co-defendant, exit the garage carrying a five-gallon jug in a

---

[14] Contrary to the dissent's assumption, our opinion does not speculate about Sokolow. We simply point out that nowhere in Sokolow did the Court state whether the garage was open or closed when the officers arrived. Likewise, we note that the Sokolow opinion did not indicate that there was a visible passageway to an access door of the home. The Sokolow opinion is only approximately one page long in its entirety, and its description of the facts is sparse. While it is theoretically possible that such passageway existed, nothing in the opinion suggests that it did. Accordingly, it is clear that Sokolow makes no holding with respect to an officer entering an open garage with a passageway to knock on a visible access door to the home. Thus, Sokolow cannot control this case.

19

sack and put it into the car alongside two other identical jugs. Id. at 474. Butler saw the officers and tried to reenter the garage. One officer followed Butler into the garage, brought him back outside, and arrested him. Someone then closed and bolted the garage from the inside. Following this, the other officer then "broke in the [front] door, entered appellant's living quarters, went through them, forced his way into the garage, and there saw appellant." Id.

The Kauz Court held that the testimony of the officers (plural) was inadmissible, indicating that, in addition to the second officer's forcible entry into the home in violation of the Fourth Amendment, the first officer's entry of the garage was also a Fourth Amendment violation. Id. Kauz is distinguishable in much the same way as Sokolow. There is no indication in the opinion that the interior door was visible at all from the driveway; the garage door was open only about three feet. Accordingly, Kauz makes no holding with respect to an officer entering an open garage to knock on a visible access door to the home. Further, while the Court excluded the testimony of both officers, the focus of the Court's rationale and holding was the second officer who "broke in the door, entered appellant's living quarters, went through them, [and] forced his way into the garage." Id. ("There is no doubt whatever that on the facts appearing in the record the search of appellant's premises was forcibly made without either a search

warrant or authority and violated her constitutional rights under the Fourth and Fifth Amendments."). Thus, <u>Kauz</u> cannot control this case.

<u>Taylor</u>, <u>Sokolow</u>, and <u>Kauz</u> establish that Fourth Amendment protection is afforded to certain garages under certain circumstances, but they cannot and do not control the answer to the question of whether this garage was entitled to Fourth Amendment protection under the circumstances of this case.

It is well-established that police officers can enter onto residential property, including portions that would be considered part of the curtilage, in order to carry out legitimate police business. 1 Wayne R. LaFave, <u>Search and Seizure: A Treatise on the Fourth Amendment</u> § 2.3(f) (4th ed. 2004) ("Thus, when the police come on to private property to conduct an investigation or for some other legitimate purpose and restrict their movements to places visitors could be expected to go (e.g. walkways, driveways, porches), observations made from such vantage points are not covered by the Fourth Amendment.") (and the cases cited therein). "This is because a portion of the curtilage, being the normal route of access for anyone visiting the premises, is only a semi-private area." LaFave § 2.3(f) (quotations omitted).

In carrying out their duties, the police are free to go where the public would be expected to go. <u>See</u> LaFave § 2.3(c) ("Thus, courts have held that police with

legitimate business may enter areas of the curtilage which are impliedly open to use by the public.") (quotations omitted); <u>Florida v. Detlefson</u>, 335 So. 2d 371, 372 (Fla. 1st DCA 1976) ("It cannot be said [that] the defendant had a reasonable expectation of privacy in the front porch of his home where, presumably, delivery men and others were free to observe the plants thereon."); <u>Tracht v. Comm'r of Pub. Safety</u>, 592 N.W.2d 863, 865 (Minn. App. 1999) ("Police with legitimate business may enter the areas of curtilage which are impliedly open to use by the public."); <u>State v. Duhart</u>, 810 So. 2d 972, 973–74 (Fla 4th DCA 2002) (holding that there was no reasonable expectation of privacy in an attached carport (initially referred to as a garage) which is open and exposed to the public, comparing the situation to <u>Detlefson</u>'s front porch where delivery men were free to go); <u>see also</u> <u>United States v. Taylor</u>, 458 F.3d 1201, 1204 (11th Cir. 2006) ("The Fourth Amendment, which prohibits unreasonable searches and seizures by the government, is not implicated by entry upon private land to knock on a citizen's door for legitimate police purposes unconnected with a search of the premises."); <u>id.</u> ("[O]fficers are allowed to knock on a residence's door or otherwise approach the residence seeking to speak to the inhabitants just an [sic] any private citizen may.") (citation and quotations omitted) (mistake in <u>Taylor</u>).

We need not decide in this case whether entering an open garage in order to

utilize a passageway to gain access to a visible door to the home is a violation of the Fourth Amendment. We hold, however, that, under the totality of the circumstances, the Deputies' entry into the Coffins' garage was a violation of the Fourth Amendment. The garage here is attached to the home itself, putting it in closer proximity to the home than an unattached garage. In contrast with a carport, the attached garage has walls on three sides and has the capability, if the outside door is rolled down, of being closed to maintain privacy. Ms. Coffin also attempted to exercise her Fourth Amendment rights. In her first conversation with Lutz, she explained that her husband might need a while before he would be able to come to the door. Lutz expressed his willingness to wait, and Ms. Coffin, by closing and locking the front door, indicated that she was maintaining her privacy in the meantime. Following this encounter, when Ms. Coffin noticed Lutz walking up to her window through her bushes, she screamed at him to get out of her bushes and off her property and threatened to call the police. Finally, and most significantly, when Lutz and Brandau remained on the property, Ms. Coffin attempted to close the garage door in order to maintain privacy in that area as well. Under these circumstances and in light of Ms. Coffin's indications that she intended to maintain privacy, we hold that entering the garage as Ms. Coffin attempted to close it was a violation of the Fourth Amendment.

IV. Qualified Immunity

We must next address whether, on the pertinent date, it was already clearly established by preexisting law that entering the Coffins open garage in the face of Ms. Coffins' attempts to exercise her Fourth Amendment privacy rights, including her request that the Deputies leave the property and her attempt to close the garage door, would violate the Fourth Amendment. We hold that the Deputies did not violate clearly established Fourth Amendment law.

In qualified immunity cases, this Court must "determine whether the right was clearly established such that a reasonable official would understand that what he is doing violates that right." Bashir v. Rockdale Cnty., Ga., 445 F.3d 1323, 1327 (11th Cir. 2006) (citation and quotations omitted). Exact factual identity with a previously decided case is not required, but the unlawfulness of the conduct must be apparent from pre-existing law. Id. at 1330–31; Vinyard v. Wilson, 311 F.3d 1340, 1350 (11th Cir. 2002). "The critical inquiry is whether the law provided [the Deputies] with 'fair warning' that [their] conduct violated the Fourth Amendment." McClish v. Nugent, 483 F.3d 1231, 1248 (11th Cir. 2007) (quoting Hope v. Pelzer, 536 U.S. 730, 741, 122 S. Ct. 2508, 2516 (2002)). It is important to emphasize that this inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.' " Brosseau v. Haugen, 543 U.S. 194, 198, 125 S. Ct.

24

596, 599 (2004) (per curiam) (quoting Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001)). Our Court looks only to binding precedent—cases from the United States Supreme Court, the Eleventh Circuit, and the highest court of the state under which the claim arose—to determine whether the right in question was clearly established at the time of the violation. See Amnesty Int'l, USA v. Battle, 559 F.3d 1170, 1184 (11th Cir. 2009).

The Coffins argue that Kyllo v. United States, 533 U.S. 27, 121 S. Ct. 2038, (2001), equates a garage with a home and clearly establishes that they are entitled to Fourth Amendment protection in their garage. The word garage appears in Kyllo only one time, and, in the very sentence in which it appears, the Supreme Court expressly distinguished between a garage and a home. See id. at 30, 121 S. Ct. at 2041 ("The scan showed that the roof over the garage and a side wall of petitioner's home were relatively hot compared to the rest of the home."). Had the Supreme Court meant to equate a garage with a home, the Court would have said "roof and sidewall of the garage." It did not say that. Rather, it said "roof over the garage and sidewall of the home."

Additionally, and significantly, in Kyllo, the police conducted a thermal-imaging scan of the *entire home*. Only by scanning the entire home and the homes of neighbors were the police able to ascertain that certain portions of the

25

premises—mainly the roof over the Kyllo's garage and the side wall of the home—were hot by comparison to the rest of their home and the homes of their neighbors. See id. (noting that certain areas were "relatively hot as compared to the rest of the home," thus making clear that the entire home was searched with the thermal-imaging scan so that the relative heat of the several areas could be compared). The police intrusion was into the home itself, as well as the garage. Because there was an intrusion into the specially-protected space of the home, there was no further need to consider the garage. And in fact, the opinion made no further mention of the garage. In sum, the Supreme Court in Kyllo had no occasion to, and did not, address the extent to which an attached garage should share the Fourth Amendment protection of the home.

Although some courts have suggested that the Fourth Amendment protection attached to the garage is the equivalent of the protection provided the home itself, see, e.g., United States v. Oaxaca, 233 F.3d 1154, 1157 (9th Cir. 2000), other courts and jurists have suggested otherwise. See Oaxaca, 233 F.3d 1154, 1159 (Graber, J., dissenting) ("Oaxaca had willingly left the garage door wide open. The garage is small, while its door is huge; and the garage faces the street at close range, so opening it exposed most of the interior to ready public view. These facts make this case closer to United States v. Santana, 427 U.S. 38, 96 S. Ct. 2406

26

(1976)"); <u>Daughenbaugh v. City of Tiffin</u>, 150 F.3d 594, 603 (6th Cir. 1998) ("[T]he divergent conclusions reached by the district court and this court concerning the status of Daughenbaugh's garage is further indication that reasonable minds can differ on whether it should be considered as part of the curtilage"); <u>United States v. Knight</u>, 451 F.2d 275, 278 (5th Cir. 1972) ("Nothing in the officers' conduct when they entered the property can be considered a search. Officer Wade, without his gun drawn, walked to the site of human activity, which was the garage adjoining the residence."); <u>cf.</u> <u>United States v. Wright</u>, 449 F.2d 1355, 1362 (D.C. Cir. 1971) ("A garage is not a house, nor is it a dwelling or a home. . . . certainly the protection afforded is something less than that afforded [a] dwelling.").

As explained in the previous section discussing whether a Fourth Amendment violation occurred, neither <u>Sokolow</u> nor <u>Kauz</u> nor <u>Taylor</u> clearly establish that entry into the open garage was a Fourth Amendment violation. <u>Sokolow</u> cannot clearly establish the law for the instant case because it is not clear from the facts of <u>Sokolow</u> whether the garage was open and whether there was a passageway from the driveway through the garage to an access door of the home. <u>Kauz</u> cannot clearly establish the law for this case because it is not clear from its facts that the officer could see an interior door from the garage to the home.  Thus,

27

neither Sokolow nor Kauz made any holding with respect to an officer entering an open garage to knock on a visible access door to the home. Taylor cannot clearly establish the law for this case because the officers in that case forcibly entered a closed garage. Thus neither Kyllo nor Taylor nor Sokolow nor Kauz clearly establish that entry into this open garage was a Fourth Amendment violation.[15]

Having concluded that no binding case law clearly established the rule of law for this case, we are left with the question of whether the Deputies' entry of the attached garage was a violation of the Fourth Amendment as a matter of obvious clarity. "[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." United States v. Lanier, 520 U.S. 259, 271, 117 S. Ct. 1219, 1227 (1997) (internal quotations omitted). Cases with "fundamentally similar" or "materially similar" facts are not necessary for a finding that the law was clearly established, but preexisting law must provide the officers with fair notice that their conduct is unconstitutional. Hope v. Pelzer, 536 U.S. 730, 741, 122 S. Ct. 2508, 2516 (2002). To find that a

---

[15] The dissent seems to place particular reliance upon Payton and its language, "the unambiguous physical dimensions of an individual's home." Payton v. New York, 445 U.S. 573, 589, 100 S. Ct. 1371, 1381–82. However, despite the dissent's repeated insistence, Payton simply did not involve a garage at all. Thus, Payton cannot clearly establish whether an open attached garage is part and parcel of the home.

broad principle of law clearly establishes the law as to a specific set of facts, "it must do so 'with obvious clarity' to the point that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." Vinyard v. Wilson, 311 F.3d 1340, 1351 (11th Cir. 2002).

Our case law has made clear that "obvious clarity" cases will be rare. See, e.g., Lee v. Ferraro, 284 F.3d 1188, 1199 (11th Cir. 2002) (referring to obvious clarity cases as a "narrow exception"); Rodriguez v. Farrell, 280 F.3d 1341, 1350 n.18 (11th Cir. 2002) ("We very occasionally encounter the exceptional case in which a defendant officer's acts are so egregious that preexisting, fact-specific precedent was not necessary to give clear warning to every reasonable . . . officer that what the defendant officer was doing must be 'unreasonable' within the meaning of the Fourth Amendment."). This is because "[p]ublic officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases." Adams v. St. Lucie Cnty. Sheriff's Dep't, 962 F.2d 1563, 1575 (11th Cir. 1992) (Edmondson, J., dissenting), approved en banc, 998 F.2d 923 (11th Cir.1993) (per curiam). "A reasonable official's awareness of the existence of an abstract right . . . does not equate to knowledge that *his* conduct infringes the right. Thus, [i]f case law, in factual terms, has not staked out a bright line, qualified

29

immunity almost always protects the defendant." Smith v. Mattox, 127 F.3d 1416, 1419 (11th Cir. 1997) (citation and quotations omitted) (per curiam). "We have noted that it would be inappropriate to hold government officials to a higher level of knowledge and understanding of the legal landscape than [that] displayed by judges whose everyday business it is to decipher the meaning of judicial opinions." Denno v. Sch. Bd. Of Volusia, Cnty., Fla., 218 F.3d 1267, 1274 (11th Cir. 2000) (citing Barts v. Joyner, 865 F.2d 1187, 1194 (11th Cir. 1989).

"Obvious clarity" cases, rare in general, will be even more rare in the Fourth Amendment expectation of privacy context because it is inherently fact-specific, thus not lending itself to clearly established law. See United States v. Dunn, 480 U.S. 294, 301, 107 S. Ct. 1134, 1139–40 (1987) (setting forth four factors as "useful analytical tools" to determine "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection"); O'Connor v. Ortega, 480 U.S. 709, 715, 107 S. Ct. 1492, 1496 (1987) (explaining that because the court "ha[s] no talisman that determines in all cases those privacy expectations that society is prepared to accept as reasonable" and "[b]ecause the reasonableness of an expectation of privacy, as well as the appropriate standard for a search, is understood to differ according to context" the Court gives weight to various factors in determining the appropriate

level of Fourth Amendment protection); <u>Oliver v. United States</u>, 466 U.S. 179, 177, 104 S. Ct. 1735, 1741 ("No single factor determines whether an individual legitimately may claim under the Fourth Amendment that a place should be free of government intrusion not authorized by warrant."); <u>United States v. Smith</u>, 978 F.2d 171, 180 (5th Cir. 1992) ("Any determination of the reasonableness of an individual's expectation of privacy is necessarily fact intensive."). For a number of reasons, we are unable to conclude that, as a matter of obvious clarity, an open attached garage is either a part of the home, or entitled to the same level of protection as the home.

One indication that this is not a matter of obvious clarity are the decisions from other courts throughout the country concluding that no Fourth Amendment violation occurred in circumstances very similar to those facing the deputies in this case.[16] <u>See, e.g.</u>, <u>United States v. Cota-Lopez</u>, 358 F. Supp. 2d 579, 590–91 (W.D.

---

[16] Only cases from the Supreme Court of the United States, the Eleventh Circuit, or the Florida Supreme Court can clearly establish the law in our Circuit, but opinions from other courts can suggest that reasonable jurists would not know that certain factual situations rise to the level of constitutional violations, and therefore reasonable officers would not either. <u>Denno v. Sch. Bd. of Volusia, Cnty., Fla.</u>, 218 F.3d 1267, 1272–76 (11th Cir. 2000) (considering a number of non-binding opinions because "[i]n [the Court's] attempt to identify the legal landscape that would have been apparent to such a reasonable school official, it is instructive to take note of the perspective of several reasonable jurists who have attempted to articulate the [relevant] legal landscape").

Contrary to the dissent's rebuke, our consideration of these non-binding cases does not assume or require that officers will sift through the law of every jurisdiction. Rather, as we noted in <u>Denno</u>, the development of the law in other jurisdictions merely reflects the legal landscape,

31

Tex. 2002) (concluding that officers' entry into an attached open garage to knock

on the service door "was entirely reasonable, and did not violate the Fourth

Amendment" because "[i]n entering the open garage, the officers merely took one

of two alternative methods of getting to the Residence (the inner garage door or

front door)"); Tracht v. Comm'r of Pub. Safety, 592 N.W.2d 863, 865 (Minn. App.

1999) (holding that where officers entered an attached garage through the open

garage door for the purpose of knocking on the interior service door "there [was]

no basis for distinguishing the officers' entry into the garage from entering a porch

to knock on a door to a house" and that therefore "[t]he officers did not violate the

Fourth Amendment by entering the garage and knocking on the service door");

State v. Akins, C4-99-1066, 2000 Minn. App. LEXIS 231, *4–11 (Minn. App.

Mar. 14, 2000) (holding that Akins had no reasonable expectation of privacy in his

attached open garage because "[p]eople's expectations for access areas of their

premises commonly differ from their expectations for more secluded areas," and

"members of the public would reasonably assume that they could use [the garage

for access], when the overhead door was open"); cf. State v. Duhart, 810 So. 2d

---

how reasonable jurists have interpreted relevant precedent, and, thus, how reasonable officers
might.

972, 973 (Fla. 4th DCA 2002) (holding that officer's entrance into an attached carport—initially referred to in the opinion as a garage—was not a violation of the Fourth Amendment because "[a]lthough it is well settled that one has an expectation of privacy in his home or its curtilage, the Fourth Amendment is not necessarily a protection in areas of the home, as in this case, which are open and exposed to public view," and citing as authority for this proposition State v. Detlefson, 335 So. 2d 371 (Fla. 1st DCA 1976), described as holding "no reasonable expectation of privacy on front porch of home where delivery men and others were free to observe plants thereon"). These cases are applications of the well-established law, mentioned above: "Courts have held that the police with legitimate business may enter areas of the curtilage which are impliedly open to use by the public." LaFave § 2.3(c).

Relatedly, when courts have extended protection to a garage, often great emphasis is given to the fact that the garage was closed. See, e.g., State v. Jenkins, 155 P.3d 1157, 1160 (Idaho 2007) (extending Fourth Amendment protection to the garage because it "was part and parcel of the structure constituting his home, and *was secured with a door closed at the time police arrived at the home*") (emphasis added); Bies v. State, 251 N.W.2d 461, 464 (Wis. 1977) ("It is not disputed that the interior of defendant's garage was within the Fourth Amendment's protection. The

33

garage was located within the curtilage of his dwelling, and it was not in any sense a semi-public area. *The overhead garage door facing on the public alley was shut, reflecting a reasonable expectation of privacy as to the interior of the garage.*") (emphasis added).  The open garage door, which both diminishes the Coffins' reasonable expectation of privacy within the garage and creates a visible passageway to an access door of the home, puts this case in a context where it is affected by a number of competing doctrines: <u>Payton</u>'s absolute protection of the home, the <u>Dunn</u> curtilage factor analysis, and areas impliedly open to public use.

Although we have concluded that, especially in light of Ms. Coffin's instruction for the officers to leave her property and her attempt to close the garage door, the Deputies' entry of the garage did in fact violate the Fourth Amendment, we cannot conclude that the law was clearly established such that reasonable officers facing these circumstances would know that their conduct would violate federal law.  Several reasons inform our conclusion in this regard.  First and foremost is the absence of any binding case law which informs these officers that they were violating the Fourth Amendment.  Second, the indications from jurists in non-binding cases that entrance into an attached open garage might not violate the Fourth Amendment, particularly where it appears that the passageway through the garage to a door to the house falls within the doctrine of areas left impliedly open

34

to use by the public. And significantly, Florida cases, of which the Deputies may well have been aware, recognize the doctrine that areas of the curtilage that deliverymen and others use might be impliedly open to the public. See State v. Duhart, 810 So. 2d 972, 973. Third, the law with respect to expectation of privacy is a fact sensitive inquiry not lending itself to clearly established law. See Oliver, 466 U.S. at 177, 104 S. Ct. 1741. Fourth, although these officers had been told once to leave the property, the Florida statute required that they serve the legal process personally. See discussion in Part II. Finally, the Deputies reasonably believed that Ms. Coffin was resisting service of legal process, a misdemeanor under Florida law, see Fla. Stat. Ann. § 843.02, which occurred in the presence of the officers, thus arguably triggering the Florida statute authorizing the officers to make an immediate arrest. See Fla. Stat. Ann. § 901.15 & (1).

Deputies Lutz and Brandau were thus faced with a very unusual scenario and had only a moment to decide what to do. "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.' " Hunter v. Bryant, 502 U.S. 224, 229, 112 S. Ct. 534, 537 (1991) (per curiam) (quoting Malley v. Briggs, 475 U.S. 335, 343, 341, 106 S. Ct. 1092, 1097, 1096 (1986)). "This accommodation for reasonable error exists because 'officials should not err always on the side of

caution' because they fear being sued." Id. (quoting Davis v. Scherer, 468 U.S. 183, 104 S. Ct. 3012, 3020 (1984)). Standing on the driveway, fully aware that the Coffins knew they were waiting to deliver process and that service of process was being obstructed, the automatic garage door began to close. This occurred while Brandau was seeking advice from a supervisor as to what to do next. The Deputies, by this time, recognized that they likely had probable cause to arrest Ms. Coffin for resisting service of process, and that Florida law gave them the right to immediately arrest. At that point, Brandau was faced with a split-second decision as to whether to enter the garage in order to reach the interior door, with all of the issues discussed in this opinion running through her mind but without the benefit of time to analyze them, and without the benefit of binding on-point case law. Although we conclude that the officers did in fact violate the Fourth Amendment under the facts and circumstances of this case, we cannot conclude, in light of all the foregoing considerations, that the officers have violated clearly-established Fourth Amendment law.[17]

---

[17] The strong language in the dissent suggests a firmly held belief that qualified immunity should not apply in this case. The dissent apparently believes either: 1) that Payton, Kyllo, Sokolow, or Kauz actually holds that an open attached garage is part and parcel of the home; or 2) that it is obvious as a matter of common sense that an open attached garage is just like "a living room, a den, or a bedroom." With respect to the former, we believe we have demonstrated at the very least that neither Payton nor Kyllo nor Sokolow nor Kauz clearly establishes that an open attached garage with a passageway to a visible door to the kitchen is part and parcel of the home. With respect to the latter, we simply disagree; we believe that deliverymen not

For the foregoing reasons, the judgment of the district court is

**AFFIRMED.**

---

infrequently use a passageway through an open garage to access a visible kitchen door in circumstances similar to the situation here.  We do not believe this garage was just like a living room, a den, or a bedroom.

BARKETT, Circuit Judge, concurring in part and dissenting in part (joined by Chief Judge Dubina and Judge Martin):[1]

The majority's opinion today does nothing less than eviscerate the once inviolate protections historically accorded the home by the Fourth Amendment of the United States Constitution. To accomplish this task, the majority ignores the most basic, bright-line principle of the Supreme Court's Fourth Amendment jurisprudence: that warrantless searches and seizures occurring within the unambiguous physical dimensions of the home are presumptively unconstitutional. The majority circumvents this fundamental precept occupying the very core of the Fourth Amendment by concluding, without any explanation, that an enclosed garage physically attached to a home—and sharing the home's roof and walls—does not exist within the unambiguous physical dimensions of the home. This conclusion rests on the faulty premise that ordinary people expect that deliverymen will come into their attached, enclosed garages and that deliverymen have a right to do so, and fails to recognize that an attached, enclosed garage is no different than any other room in the house, and is thus entitled to the same blanket Fourth Amendment protections as a living room, a den, or a bedroom.

---

[1] My concurrence with the majority is limited to its conclusion that the deputies violated the Coffins' constitutional rights.

Nor can this conclusion be squared with binding precedent from both the Supreme Court and this Court clearly establishing that garages are entitled to such constitutional protection, which gave the deputies fair warning that their conduct violated the Coffins' constitutional rights. While the majority finds a Fourth Amendment violation in this case, it does so, not by recognizing the garage's obvious status as another room in the house, but rather by applying, without support and in conflict with Supreme Court precedent, a newly minted "totality of the circumstances" test which looks to whether its door is open or closed and whether a person has repeatedly told officers to leave it. The majority opinion upends not only the law of search and seizure but the law of qualified immunity as well.[2]

---

[2] Although I believe that this case should be resolved on the ground that the Coffins relied upon—that the deputies' warrantless entry into the Coffins' home violated the Coffins' clearly established constitutional rights, regardless of whether the deputies had probable cause to arrest Mrs. Coffin—I also believe that the majority's exposition of Florida law on the probable cause issue is just wrong. Despite the fact that this issue was not squarely before this en banc Court, the majority goes far out of its way to decide that probable cause for the arrest existed. Nothing in Florida law comes close to supporting this proposition.

The majority reaches the untenable conclusion that Mrs. Coffin reasonably appeared to obstruct justice merely by failing to open the front door of her house. Maj. Op. at 13-14. But "[t]he threshold for establishing the commission of [obstruction] under [§ 843.02, Fla. Stat.] is that the officer be in the 'lawful execution' of a 'legal duty.' To meet this threshold, the conduct of the officer must be consistent with the Fourth Amendment . . . ." C.E.L. v. State, 995 So. 2d 558, 560 (Fla. Dist. Ct. App. 2008), aff'd, 24 So. 3d 1181 (Fla. 2009). Under the Fourth Amendment, the deputies could not have lawfully required Mrs. Coffin to open her front door because they did not possess a warrant of any sort. See Kentucky v. King, 563 U.S. —, slip op. at 16 (May 16, 2011) ("When law enforcement officers who are not armed with a warrant knock on a door . . . . the occupant has no obligation to open the door or to speak."); United States v. Tobin, 923 F.2d 1506, 1512 (11th Cir. 1991) (en banc) (recognizing that the occupants of a house are "free to deny [an officer's] request [to enter] and alternatively talk to the [officers] through a closed door" when the officers lack a warrant). Thus, Mrs. Coffin's failure to open her door did

39

# I. **Background**

The majority omits many facts, viewed in the light most favorable to the Coffins, that illustrate precisely why the Fourth Amendment's bright-line rule prohibiting warrantless entry into a home is so essential. When Deputy Brandau

---

not obstruct the lawful execution of a legal duty; she merely exercised her Fourth Amendment rights. Cf. Rodriguez v. State, 964 So. 2d 833, 837 (Fla. Dist. Ct. App. 2007) (holding that individual did not commit obstruction by telling the deputy to get off his property and retreating to his house when the "deputy had only attempted to engage him in a consensual citizen encounter"); H.H. v. State, 775 So. 2d 397, 398-99 (Fla. Dist. Ct. App. 2000) (not obstruction to flee when the officers had no authority to detain individual); R.S. v. State, 531 So. 2d 1026, 1026-27 (Fla. Dist. Ct. App. 1988) (not obstruction to refuse to answer questions when officers had no authority to demand an answer). The majority's response to this basic tenet of constitutional law is that "the Deputies here did not enter the home; rather they entered an open garage to access and knock on the visible door to the kitchen." Maj. Op. at 14 n.12. But this response confuses the point. Whether the deputies violated the Fourth Amendment by entering th garage, while central to the rest of this case, is a separate question from whether they had probable cause to arrest Mrs. Coffin for obstructing justice. As they lacked the authority to compel Mrs. Coffin to open any door of her home, her failure to open the front door and attempt to close the garage door, regardless of the constitutionality of the deputies subsequent entry into the garage, could not have constituted obstruction of justice because she had a Fourth Amendment right to do what she did.

Moreover, Florida law makes clear that, despite Mrs. Coffin's failure to physically take the restraining order from the deputies' hands, the deputies could have nonetheless effectively served process by leaving the restraining order in the mailbox or on the front doorstep. See Liberman v. Commercial Nat'l Bank of Broward Cnty., 256 So. 2d 63, 64 (Fla. Dist. Ct. App. 1971) (mail box); Haney v. Olin Corp., 245 So. 2d 671, 672-74 (Fla. Dist. Ct. App. 1971) (front doorstep). Recognizing this point, the majority asserts that a restraining order is somehow a distinct form of legal process that must be physically placed in the intended recipient's hands. That assertion, however, finds no support in Florida law. See, e.g., Top Dollar Pawn Too, Inc. v. King, 861 So. 2d 1264, 1265-66 (Fla. Dist. Ct. App. 2003) (applying general service-of-process law to service of a temporary restraining order); Palamara v. World Class Yachts, Inc., 824 So. 2d 194, 195 (Fla. Dist. Ct. App. 2002) (holding that defendant had been "personally served" when process server left process on defendant's door); see also Fla. R. Civ. P. 1.070 (governing "personal service" of initial pleadings and court orders). Thus, Mrs. Coffin's failure to open her front door could not have constituted obstruction of justice. The majority's conclusion that the deputies had probable cause to arrest her runs contrary to both Florida law and the sanctity of the home.

stepped inside the Coffins' garage, triggering the sensor to stop the door from closing, Deputy Lutz followed her into the garage, and Mrs. Coffin was told she was going to be arrested for obstruction of justice. Mrs. Coffin's "offense" consisted of refusing the officers' warrantless entry into her home, a right guaranteed to her by the Fourth Amendment.[3] She told the officers she was "baffled" as her husband had already been served, and attempted to enter her hallway to get the papers to show to the deputies. Unbelievably, at that point, Brandau grabbed her left arm and Lutz grabbed her right arm, standing on her bare foot and fracturing her toe. In pain, Mrs. Coffin screamed and fell to the floor. Lutz then twisted Mrs. Coffin's right arm behind her back and attempted to handcuff her, tearing her rotator cuff. Hearing his wife scream, Mr. Coffin entered the garage, to find his wife in pain, with Lutz's foot on her chest and her arm twisted behind her back.

As Mr. Coffin reached for his wife's hand, Brandau shoved him back into the kitchen and threatened to shoot him with a Taser. Lutz released Mrs. Coffin, followed Brandau into the kitchen, and urged her to Taser Mr. Coffin. Worried that a Taser could kill her husband, since he had undergone a five-way bypass surgery, Mrs. Coffin rushed inside and held onto her husband, pleading with the deputies not

---

[3] No statute or case law permits uninvited entry into a home to serve a civil injunction. The majority cites none and I have found none.

to Taser him.  Ignoring that plea, Brandau shot Mr. Coffin with the Taser.  Lutz then

grabbed Mrs. Coffin and threw her into the adjacent laundry room, causing her to

fall on her hip.  Mrs. Coffin got up to reenter the kitchen as Mr. Coffin was

retreating towards the laundry room because Brandau, having already shot him with

her Taser, was hitting him in the stomach with her baton.  Stumbling back, Mr.

Coffin fell into Lutz, who in turn fell back into Mrs. Coffin, causing all three to fall

in a pile on top of one another in the laundry room.  For the next several minutes,

Brandau stood over Mr. Coffin and continued to swing her baton at him,

inadvertently striking Lutz in the head.  Mr. Coffin, who had his hands up trying to

protect himself, eventually managed to separate Brandau from her baton, at which

point Brandau left and went into the garage.  Mr. Coffin walked into the kitchen,

placed the baton on the counter, and sat down on the floor.       Lutz then got to his

feet and stood over Mrs. Coffin in the laundry room and, with "fire in his eyes," put

his gun to her head and cocked it.  Hearing the door open again, Mrs. Coffin yelled,

"he's got a gun!  He's got a gun!"  Another officer entered the room, said "hey, hey,

hey," to Lutz, and took the gun from Lutz's hands.  Other officers arrived on the

scene and the Coffins were both arrested.[4]

---

[4] After an internal affairs investigation, the deputies were found to have violated the
Sarasota Sheriff's Department's general order requiring conformity to the law, and were
suspended without pay for 160 hours and ordered to complete remedial training relating to search

## II. <u>The Deputies' Warrantless Entry Into The Coffins' Garage Violated Their Clearly Established Constitutional Rights</u>

At "the very core" of the Fourth Amendment is "the right of a man to retreat into his own home and there be free from unreasonable government intrusion." <u>Silverman v. United States</u>, 365 U.S. 505, 511 (1961); <u>see</u> <u>United States v. U.S. Dist. Court</u>, 407 U.S. 297, 313 (1972) (explaining that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed"). While the Fourth Amendment protects an individual's reasonable expectation of privacy from government intrusion in a variety of settings, "[i]n none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home." <u>Payton v. New York</u>, 445 U.S. 573, 589 (1980). Thus, "the Fourth Amendment has drawn a firm line at the entrance to the house," <u>id.</u> at 590, and "any invasion of the <u>structure</u> of the home, 'by even a fraction of an inch,' [is] too much," <u>Kyllo v. United States</u>, 533 U.S. 27, 37 (2001) (quoting <u>Silverman</u>, 365 U.S. at 512) (emphasis added).

Here, the undisputed facts demonstrate that the Coffins' attached garage was part of "the unambiguous physical dimensions of [their] home," <u>Payton</u>, 445 U.S. at

---

and seizure law. On administrative appeal, the allegations against the deputies were sustained, but their penalty was reduced to 40 hours suspension without pay and no remedial training!

589.[5]  The garage was not a separate building; it was not a porch with open sides or a carport, likewise open on all sides.  Rather it was part of the footprint of the house, completely enclosed by the contiguous, exterior walls of the house and covered by the same roof.  See Appendix (picture of the Coffins' home).  Like the front door, the automatic garage door could be closed and locked to prevent entry by trespassers.  And because it contained a doorway leading to the other rooms, it was unnecessary to exit the house in order to go from the garage to any other room or vice versa.  Accordingly, there is "no reason to distinguish [the Coffins' attached] garage, where [they] spend time, work, and store their possessions, from [their] den or [their] kitchen, where [they] spend time, work, and store their possessions. Simply put, a person's garage is as much a part of his castle as the rest of his home." United States v. Oaxaca, 233 F.3d 1154, 1157 (9th Cir. 2000).[6]

--------

[5] The majority's rationale for disregarding Payton is that it "did not involve a garage at all." Maj. Op. at 17.  But this reasoning ignores the "unambiguous physical dimensions of the home" language in Payton.  The Supreme Court expressly held that the police may not, without a warrant, cross the threshold of any room that falls within the "unambiguous physical dimensions of the home," period. 445 U.S. at 589.  But under the majority's reasoning, the police may cross the threshold of any room within the unambiguous physical dimensions of the home, so long as that type of room was not expressly discussed in Payton.  Thus, according to the majority, the police may enter, for instance, a den, kitchen, or basement, despite the fact that it falls within the unambiguous dimensions of the home.  This conclusion simply cannot be squared with Payton.

[6] None of the features of a garage that the majority identifies, Maj. Op. at 23-24, provides any justification for distinguishing an attached, enclosed garage from the rest of a home. Opening any door, or even a window, exposes the interior of a home to public view, just as opening a garage door does; and regardless of the garage door's relative size, it, like any other door to a house, can be closed to maintain privacy and prevent others from entering.  Indeed, the

Indeed, by failing to recognize that an attached garage is simply another room in the house, the majority ignores the realities of modern day American society. Garages are now commonly put to a wide variety of intimate uses; for instance, Americans across the country are using attached garages as parking spaces, gyms, work spaces, laundromats, recording studios, storage facilities, and game rooms. In this respect, an attached, enclosed garage within the building's footprint is no different than, say, a bedroom used only for storage. Because these areas exist within the unambiguous physical dimensions of the home, the use to which they are put (or not put) is constitutionally irrelevant: the Fourth Amendment recognizes without qualification that, within those physical dimensions, "all details are intimate details." Kyllo, 533 U.S. at 37.

Nor is it constitutionally relevant whether a room within these dimensions happens to be visible to outsiders. Under Supreme Court precedent, which the majority ignores, the fact that the Coffins' garage door was open is legally irrelevant. In Payton, police officers saw one of the defendants sitting in bed through his open apartment door, entered without a warrant, and arrested him. 445

---

fact that a garage door may be larger than a front door and opening it may reveal more of a home's contents cannot be decisive, because that would mean that having a large front door, or sliding glass door, or even large open window that passes some undefined and arbitrary size threshold would strip the entire house of Fourth Amendment protection. Surely, no authority supports this necessary and absurd implication of the majority's position.

U.S. at 578. Although the officers had probable cause to arrest the defendant for armed robbery, the Court reversed the conviction because the officers had crossed the threshold of his home without a warrant. Id. at 576, 603. Thus, Payton unambiguously held that the Fourth Amendment prohibits law enforcement officials from entering the unambiguous physical dimensions of the home without a warrant, whether its door is open or shut. Id. at 589-90.

Because the Coffins' attached garage, like the Payton defendant's bedroom, existed within the unambiguous physical dimensions of the home, the Fourth Amendment protected it, as a matter of law, even though the deputies could see inside. The deputies, therefore, violated the Fourth Amendment by crossing its threshold and arresting Mrs. Coffin inside.

Validating this point, several Supreme Court and Eleventh Circuit cases have recognized that the Fourth Amendment protects an attached garage just as it does any other room in the house. In Kyllo, the Supreme Court held that a thermal-imaging scan detecting "that the roof over the garage and a side wall of [the] petitioner's home were relatively hot compared to the rest of the home and substantially warmer than neighboring homes" constituted a warrantless search of the home in violation of the Fourth Amendment. 533 U.S. at 30 (emphasis added). As its reliance on Payton shows, id. at 40, the Court treated Kyllo's attached garage

46

as a part of his home, and thus clearly established that the Fourth Amendment applies to an attached garage in the same way it applies to any other room in the home.

The majority disregards <u>Kyllo</u> because it reads the "sidewall of petitioner's home" language as meaning that the unreasonable search was conducted in a part of the home un-associated with the garage, and because the word "garage" appears only once in the opinion. These attempts at distinguishing <u>Kyllo</u> do not withstand careful scrutiny.

First, the majority is incorrect in reading the Supreme Court's reference to a "side wall" to mean that the hot spot revealed by the thermal imaging scan was some part of Kyllo's home other than his garage. The scan indicated that Kyllo "had been using halide lights to grow marijuana in his house," 533 U.S. at 30; and since the only room mentioned as being relatively hot was the garage, and a growing operation with lamps and plants obviously cannot be located <u>within</u> a wall, the only logical way to read the opinion is that the scan revealed that Kyllo had been growing marijuana in his garage. As such, regardless of whether the scan also obtained evidence from other parts of Kyllo's home, the Court had to consider the lawfulness of the scan of the garage, because that is where the evidence at issue was obtained, and the Court's holding—that the thermal imaging scan was an

47

unconstitutional search because it obtained evidence regarding the interior of the home—was clearly and necessarily premised on the legal conclusion that the garage was entitled to the protections accorded the home by the Fourth Amendment. See id. at 40. Indeed, the fact that the Supreme Court, applying Payton, analyzed the search of the garage no differently than the search of the rest of the house, and ultimately ruled that the evidence from the garage was unlawfully obtained, demonstrates that it considered the garage a part of the home.

Moreover, the fact that the word "garage" appears only once in Kyllo actually supports the proposition that a garage must be considered a part of the home for Fourth Amendment purposes. It shows that there was no need for some elaborate analysis equating a garage with a home. Thus, the majority has no valid basis for disregarding Kyllo, and for concluding that Payton's bright-line rule prohibiting warrantless entry into the home does not apply here.

Another case, squarely on-point, is the former Fifth Circuit's decision in Kauz v. United States, 95 F.2d 473 (5th Cir. 1938).[7] In that case, the defendant moved to suppress testimony from officers who entered and searched the defendant's garage without a warrant. Id. at 473-74. Like the Coffins' garage, the garage in Kauz was

---

[7] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

part of the same building that housed the defendant's living quarters, had a door leading to the living quarters, and had a sliding door that opened onto the street. Id. at 473. When the officers arrived at the building, the garage's sliding door "was open about three feet." Id. at 474. As the deputies did here, one of the officers entered the open garage and arrested a co-defendant. Id. Someone then closed the sliding door, just as Mrs. Coffin did. Id. Nonetheless, a second officer forced his way into the garage, through the defendant's living quarters, and once inside, "detected the smell of moonshine whisky, which [the officer] thought came from recently broken jugs." Id. Holding that the officers' search of the defendant's premises violated her constitutional rights, the former Fifth Circuit concluded that "the testimony of the officers as to what they saw in the garage was . . . inadmissible." Id. (emphasis added). Significantly, the Court did not restrict its ruling to the testimony of the officer who forced his way into the garage through the defendant's living quarters, but also held that the officer who entered the attached garage when the door was open violated the defendant's constitutional rights. Because the deputies did the same thing here, Kauz controls this case.[8]

---

[8] The majority speculates that the interior door connecting the residence to the garage might not have been visible from the street. But it would be illogical to strip a garage of Fourth Amendment protection when officers can see such a door, because the existence of the door only supports the conclusion that an attached, enclosed garage is indistinguishable from any other room in the home also containing such a door. Under the majority's reasoning, if officers can see a door connecting a bedroom, den, or kitchen to the rest of the home, they may enter the room to

Indeed, even when it is unclear whether a garage is attached or not, the case law is unambiguous that a warrantless entry into a garage is constitutionally prohibited. First, there is the Supreme Court's decision in <u>Taylor v. United States</u>, 286 U.S. 1 (1932). In that case, the Court held that Prohibition agents violated the Fourth Amendment when they seized liquor from a "garage adjacent to [a] residence" without a warrant. <u>Id.</u> at 3. The garage was "a small metal building" that was "on the corner of a city lot and adjacent to the dwelling in which petitioner Taylor resided." <u>Id.</u> at 5. The Court held that the garage was protected by the Fourth Amendment as "part[] of the <u>same premises</u> [as the residence]." <u>Id.</u> at 5 (emphasis added).[9]

Likewise, in <u>United States v. Sokolow</u>, 450 F.2d 324, 325-26 (5th Cir. 1971), the former Fifth Circuit specifically held, without qualification, that an officer's

---

access other parts of the home. Nothing in logic or authority supports this conclusion.

Likewise, contrary to the majority's assertion, <u>Kauz</u> cannot be distinguished on the ground that the garage in that case was "only" open three feet. Maj. Op. at 20. The three-foot opening was indisputably large enough for the officers in <u>Kauz</u> to enter the garage and see inside, which is the critical fact according to the majority.

Finally, the fact that the Court focused more on the officer who entered the defendant's living quarters does not change the fact that the Court's <u>holding</u> was that the officer who entered the garage directly through the open door also violated the Fourth Amendment. The Court's <u>holding</u>, not the structure of its opinion, is all that matters.

[9] The majority attempts to distinguish <u>Taylor</u> on the ground that the garage in that case was closed. That distinction, however, is irrelevant under <u>Payton</u>, as discussed above, and also ignores the undisputed fact that Mrs. Coffin had attempted to close her garage door. Just as the officers in <u>Taylor</u> forced their way into the garage by breaking a lock, the deputies here forced their way into the Coffins' garage by triggering an electronic sensor when the door was closing.

warrantless entrance into the defendant's garage violated the Fourth Amendment.
In that case, a police officer observed air conditioning units inside of the
defendant's garage that he suspected were stolen. <u>Id.</u> at 325. The contents of the
garage, like those of the Coffins' garage, were visible from the outside. <u>Id.</u> Like the
deputies did in this case, the officer entered the garage without a warrant. <u>Id.</u> This
Court held that the officer could not enter the defendant's garage without a warrant
and suppressed the evidence obtained from the unconstitutional entry. <u>Id.</u> at 326.
Thus, the case stands for the proposition that the Fourth Amendment prohibits entry
into a residential garage, regardless of whether officers could see inside it.[10]

The majority asserts that the authority discussed above does not control this
case because a "number of competing doctrines" must also be considered, and lists
(1) "the <u>Dunn</u> curtilage factor analysis," and (2) "areas impliedly open to public
use." Maj. Op. at 30-31. Like Cinderella's step-sisters, the majority attempts to
shoehorn these inapplicable "doctrines" forcefully into this case, despite the clear
misfit.

The first doctrine the majority mentions—curtilage—is wholly inapplicable

---

[10] As with <u>Kauz</u>, it is irrelevant whether the garage in <u>Sokolow</u> might have lacked a
visible passageway to another door of the home. Nor it relevant under <u>Payton</u> whether the garage
door was open or closed. While the majority speculates about these facts in an attempt to
distinguish <u>Sokolow</u>, the holding of the case remains clear that entering a residential garage
without a warrant is constitutionally impermissible.

because inherent in the very definition of curtilage is that it applies only to land outside, or structures existing apart from, the actual dwelling.  The purpose of curtilage analysis is to determine whether the area or structures outside the residence should be given the same Fourth Amendment protection accorded the residence, not whether certain rooms within the four walls of the residential structure enjoy the same Fourth Amendment protection as other rooms within that structure.  See United States v. Dunn, 480 U.S. 294, 300-03 (1987) (analyzing whether areas surrounding a barn were curtilage).  "The curtilage concept originated at common law to extend to the area immediately surrounding a dwelling house the same protection under the law of burglary as was afforded the house itself."  Dunn, 480 U.S. at 300 (emphasis added).  As further explained in Dunn:

> In defining the terms "mansion or dwelling house," Blackstone wrote that "no distant barn, warehouse, or the like are under the same privileges, nor looked upon as a man's castle of defence . . . ." 4 W. Blackstone, Commentaries 225. Blackstone observed, however, that "if the barn, stable, or warehouse, be parcel of the mansion-house, and within the same common fence, though not under the same roof or contiguous, a burglary may be committed therein; for the capital house protects and privileges all its branches and appurtenances, if within the curtilage or homestall." Ibid.

Id. at 300 n.3 (emphasis added).  Thus, a dwelling was defined at common law as the home and all areas "under the same roof or continguous," like the Coffins'

garage, while curtilage was defined as the structures "within the same common fence."[11] There is not a single Supreme Court, Eleventh Circuit, or Florida Supreme Court case applying the curtilage doctrine to a room under the same roof and within the contiguous walls of the house. Indeed, doing so would be inconsistent with Payton's bright-line and unambiguous rule that the "threshold [of a home] may not reasonably be crossed without a warrant." 445 U.S. at 590. Even in Dunn, the Supreme Court assumed that the actual "barn enjoyed Fourth Amendment protection and could not be entered and its contents seized without a warrant." 480 U.S. at 303. In holding that the officers did not violate the Fourth Amendment by peering into the barn from an open field, it emphasized that "the officers never entered the barn, nor did they enter any other structure on respondent's premises." Id. at 304. Thus, Dunn provides no support for the proposition that police may enter, as opposed to peer inside, a residential structure when its door is open.

As to the "competing doctrine" of "areas impliedly open to public use," the

---

[11] Ignoring this well-established understanding of the curtilage doctrine, the majority asserts that the fact that the Coffins' attached garage was open provides a reason to apply the curtilage doctrine here. But this reasoning is circular. That the garage was open would have been a relevant consideration only if the curtilage doctrine applied, see Dunn, 480 U.S. at 301, but it begs the question to also use that fact as reason to decide that the curtilage doctrine is applicable to begin with; in other words, the fact that an area is observable to people passing by is one of the four factors identified in Dunn for distinguishing between an open field and curtilage, so it is circular to simultaneously rely on that fact to justify applying the four-factor test in the first place.

majority relies upon general statements from a treatise and several cases from intermediate appellate courts involving facts so far removed from those of this case that they have no relevance here.  They address areas <u>outside</u> the four walls of a home, such as open walkways and driveways leading up to the home, porches with no enclosed walls outside the house, and carports with no walls at all.  Maj. Op. at 18-20 (citing 1 Wayne R. LaFave, <u>Search and Seizure: A Treatise on the Fourth Amendment</u> § 2.3(f) (4th ed. 2004) (walkways, driveways, porches), <u>State v. Detlefson</u>, 335 So. 2d 371, 372 (Fla. Dist. Ct. App. 1976) (front porch that was open and visible to people on the street), and <u>State v. Duhart</u>, 810 So. 2d 972, 973-74 (Fla. Dist. Ct. App. 2002) (carport that was open and exposed to public view, expressly distinguished from a garage, and likened to a front porch)).[12]  None of these treatises or cases address an attached, enclosed garage that is within the building's footprint, and under the same roof as the house.  Such a garage is nothing like a walkway, driveway, front porch, or carport, all of which are outside the house and lack walls.

---

[12] The majority also cites this Court's decision <u>United States v. Taylor</u>, 458 F.3d 1201, 1204 (11th Cir. 2006), Maj. Op. at 20, which addressed the permissibility of approaching a residence and knocking on the front door, not crossing the threshold of a structure and performing a search or seizure.  This "'knock and talk' exception to the Fourth Amendment's requirement for a warrant," 458 F.3d at 1205, would only apply to Deputy Lutz's initial approach to the Coffins' front door, not the deputies' subsequent entry into the garage and seizure of Mrs. Coffin.

Perhaps the majority focuses on this so-called doctrine of "areas impliedly open to public use" because it believes that the "doctrine" somehow supports its central premise that people reasonably expect deliverymen to enter their attached, enclosed garages and that deliverymen have a right to do so. This premise, however, is unrealistic and unwarranted. I believe that most Americans do not expect, and would not permit, strangers, including deliverymen, to enter and roam through their attached, enclosed garages. The majority cites no authority for its assertion that deliverymen have the right to enter an attached, enclosed garage without consent. Indeed, it is unlawful in Florida to enter a residential garage without the owner's permission. G.D. v. State, 557 So.2d 123, 124 (Fla. Dist. Ct. App.1990) (holding that there "was sufficient evidence to support the adjudication for trespass to the unoccupied dwelling in the garage" when defendant entered the garage of a vacant house without the owner's permission).

In holding that these "competing doctrines" apply, the majority ignores Payton's bright-line rule prohibiting warrantless entry into the home and effectively removes the Supreme Court's presumption that individuals have a protected expectation of privacy in their homes. Under the majority's opinion, instead of the presumption of privacy in the home, individuals will bear the burden of showing that they have a reasonable expectation of privacy in each separate room in their

55

home, requiring them to keep every door shut and every curtain drawn in order to secure the protections of the Fourth Amendment within their homes. This ruling strikes at "the very core" of the Fourth Amendment. Silverman, 365 U.S. at 511.

## III.  The Law of Qualified Immunity

Not only does the majority erode the protections of the Fourth Amendment, but, in holding that the Coffins' constitutional rights were not clearly established, it also distorts the law of qualified immunity in several ways. First, in relying upon dissents, even from other circuits, as well as opinions from intermediate state appellate courts, Maj. Op. at 23, 29-30, the majority appears to abrogate, in a one-sided way, our well-established rule that limits the relevant universe of cases for qualified immunity purposes to those of the United States Supreme Court, Eleventh Circuit, and highest court of the pertinent state. Marsh v. Butler Cnty., 268 F.3d 1014, 1032 n.10 (11th Cir. 2001) (en banc). While the majority appears to still require § 1983 plaintiffs to follow our prior rule to prove that their rights were clearly established, it now permits defendants to rely on the opinions of any jurist in any jurisdiction to prove that the law was not clearly established. See Maj. Op. at 28 n.12 ("[O]pinions from other courts can suggest that reasonable jurists would not know that certain factual situations rise to the level of constitutional violations, and therefore reasonable officers would not either."); id. at 31 (relying on "indications

56

from jurists in non-binding cases" and intermediate state appellate court decisions "of which the deputies may well have been aware" to conclude that the Coffins' rights were not clearly established). This double standard makes no sense. The basis for restricting our focus to binding case law is that "[w]e do not expect public officials to sort out the law of every jurisdiction in the country." Marsh, 268 F.3d at 1032 n.10. Now, apparently, we assume that public officials will search through the law of every jurisdiction, and only pay attention to those cases that support the position they want to take—even if it's from a dissent![13]

The majority also distorts qualified immunity law by declaring that it will be exceedingly "rare" for a general constitutional rule to apply with obvious clarity to a defendant's conduct in § 1983 cases alleging a Fourth Amendment violation. Maj. Op. at 27-28. The decisions the majority cites simply do not say that. Instead, the decisions stand for the unremarkable proposition that the question of whether a particular expectation of privacy is reasonable often is fact intensive. But here, the Coffins' claims do not require a fact-intensive analysis. Payton's bright-line rule

---

[13] Contrary to the majority's assertion, Denno v. Sch. Bd. of Volusia, Cnty., Fla., 218 F.3d 1267 (11th Cir. 2000), cannot support its reliance on dissents and non-binding precedents, because Denno pre-dates our en banc decision in Marsh, 268 F.3d at 1032 n.10, which restricted our focus to "decisions of the U.S. Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state" when determining whether a right was clearly established.

prohibiting warrantless entry into the home applies with obvious clarity to the deputies' warrantless entry into the Coffins' home.

Finally, the majority's hyper-technical and counterfactual reading of Kyllo, Kauz, Sokolow, and Taylor contravenes the standard set forth in Hope v. Pelzer, 536 U.S. 730 (2002), for determining whether binding precedents clearly established a constitutional right.  In Hope, the Supreme Court chastised this court for imposing an unduly rigid gloss on the clearly established prong of the qualified immunity standard.  Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1277 (11th Cir. 2004) ("This circuit was recently chastised by the Supreme Court for taking an unwarrantedly narrow view of the circumstances in which public officials can be held responsible for their constitutional violations.").  Overruling this Court's standard, which had required that the facts of previous cases be materially similar to the facts of the case before the Court, the Supreme Court held that a right is clearly established when, "despite notable factual distinctions between the precedents relied on and the cases then before the Court . . . the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." Hope, 536 U.S. at 740 (internal quotation marks omitted).  Applying the proper standard, the Supreme Court concluded that two of our prior precedents gave the Hope defendants fair warning that handcuffing prisoners to a hitching post for seven

58

hours was constitutionally impermissible, despite the fact that one case addressed several forms of punishment, including handcuffing inmates to cells or fences (as opposed to hitching posts) for prolonged periods of time, and the other case's broad premise (as opposed to its specific holding) was that, in general, physically abusing a prisoner for past misconduct would violate the Eighth Amendment. Id. at 742-44. This Court's contrary conclusion "expose[d] the danger of a rigid, overreliance on factual similarity." Id. at 742.

In this case, the applicable binding precedents are even more factually similar to the deputies' conduct than the precedents in Hope were to the prison officials' conduct, and thus gave the deputies fair warning that their conduct violated the Coffins' constitutional rights. The garage, like every other room in the Coffins' home, was within the confines of the home, and Payton says that officers cannot put one foot into the confines of a home without a warrant; Kyllo held that a warrantless search of a garage violates the Fourth Amendment; and Kauz, Sokolow, and Taylor held that entering a garage without a warrant violates the Fourth Amendment. There is nothing unclear or confusing about the straightforward holdings of these cases. The majority ignores the language and holdings of these cases, and seizes upon irrelevant, hypothetical facts and legal theories that were neither mentioned nor considered in any of these cases to say that they did not provide fair notice that

entering an attached, enclosed garage without a warrant violates the Fourth Amendment.[14]  Simply put, the majority does exactly what the Supreme Court chastised this Court for doing in Hope.  Reading these cases on their own, ordinary people, and especially reasonable officers, would understand clearly that an attached, enclosed garage is protected by the Fourth Amendment.

---

[14] As noted, the majority focuses on the extent to which the garage in Kauz was open, and speculates that the garage might have lacked a visible passageway to the rest of the home, even though the decision never says so; it likewise speculates that the garage in Sokolow might have been closed and also lacked a visible passageway to the house, even though, again, the decision never says so; it faults Kyllo for mentioning the word "garage" only once and incorrectly assumes that the relevant search was conducted in a part of the house separate from the garage; and it disregards Taylor because the garage in that case was closed, even though the decision does not expressly rely on the fact that the door was closed.

# APPENDIX



The Coffins' Home[15]

_____

[15] Dist. Ct. Docket Entry 44-5 (Ex. D-Photograph of Coffins' Home).

HULL, Circuit Judge, concurring in part and dissenting in part (joined by Judge Martin):[1]

In my view this is an open-and-shut case, not an "open garage" case.

First, I agree with Judge Barkett's description of these key, undisputed facts:

[T]he Coffins' attached garage was part of "the unambiguous physical dimensions of [their] home," . . . . The garage was not a separate building; it was not a porch with open sides or a carport, likewise open on all sides. Rather it was part of the footprint of the house, completely enclosed by the contiguous, exterior walls of the house and covered by the same roof. See Appendix (picture of the Coffins' home). Like the front door, the automatic garage door could be closed and locked to prevent entry by trespassers. And because it contained a doorway leading to the other rooms, it was unnecessary to exit the house in order to go from the garage to any other room or vice versa.

Barkett, J., concurring in part and dissenting in part, at 44 (second alteration in original).

Second, I recognize that the majority focuses on a difficult open-door question. However, we need not resolve the open-door issue because, as I understand the undisputed facts, Plaintiff Mrs. Coffin had already refused the Defendants entry at her front door, had pushed the automatic button to close her garage door, and her garage door was closing before Defendant Deputy Brandau's

_____

[1]My concurrence with the majority is limited to its conclusion that the deputies violated the Coffins' constitutional rights.

entry.

Mrs. Coffin had completed what she needed to do to close her door. Indeed, the deputies were standing about five feet from the garage when Mrs. Coffin pushed the automatic button to shut her garage door. Seeing that the garage door was closing, Defendant Brandau stepped into the garage, breaking the electronic-eye safety beam for the door and causing the garage door to retreat to its open position. Mrs. Coffin had effectively closed her garage door and Defendant Deputy Brandau opened it back up by breaking the electronic beam and stopping its closing. Defendant Deputy Lutz witnessed this act. Brandau entered the garage; Lutz followed.

In short, the deputies violated Mrs. Coffin's Fourth Amendment rights when they entered her closed garage door, and the Fourth Amendment law was clearly established that the deputies could not enter Mrs. Coffin's home after she closed the door. See Vineyard v. Wilson, 311 F.3d 1340, 1355 (11th Cir. 2002) (considering the plaintiff's version of the events and concluding the "obvious clarity" standard, although difficult to meet, was satisfied in relation to the clearly established law issue).

MARTIN, Circuit Judge, concurring in part and dissenting in part (joined by Chief Judge Dubina):[1]

I fully concur in Judge Barkett's dissenting opinion because the Fourth Amendment rights the Deputies violated here were clearly established. I write separately only to emphasize that just as Mr. and Mrs. Coffin have been denied relief for this intrusion into their home, the "totality of the circumstances" test established in the majority opinion does nothing to protect people in their homes from similar intrusions in the future. Specifically, the indefinite standard established by the court today reduces to one the clearly established circumstances under which a person can prevent law enforcement from entering her garage, attached to her home, even where the officer has no warrant, and where the homeowner actively protests the entry.

The "firm line" that the Fourth Amendment draws at the entrance of the house "must be not only firm but also bright." Kyllo v. United States, 533 U.S. 27, 40, 121 S. Ct. 2038, 2046 (2001). Before today, our binding precedent, which established that an attached garage is treated as part of the "house" under the Fourth Amendment, drew a firm and bright line. But rather than apply Kyllo's bright line

_____

[1] I concur in the majority's holding that Mr. and Mrs. Coffin's Fourth Amendment rights were violated.

rule, the majority now sets a standard that relies on a number of context-specific and circumstance-dependent factors. In doing so, this court has stripped the Coffins of the very rights that the Fourth Amendment was intended to protect.

Until today, "any physical invasion of the structure of the home, 'by even a fraction of an inch,' was too much." Kyllo, 533 U.S. at 37, 121 S. Ct. at 2045. But now in this Circuit, neither police nor citizens have advance notice of the bounds of the Fourth Amendment. What will happen in the next case? For example, if a person who normally keeps the door of her attached garage closed is slow to close it upon her return from work at 6:30 p.m., is law enforcement now free to dart into the momentarily open door? Is law enforcement allowed to then go through the garage into the house? The shifting standard established here not only muddles our Fourth Amendment jurisprudence, but threatens to strip the home of its sanctity. Indeed, I fear that this case may present the first of many unconstitutional entries into homes that are no longer prohibited by clearly established law. For this reason, in addition to those set out by Judge Barkett in her dissent, I respectfully dissent from the majority opinion.

65

A True Copy - Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit

By: _____
Deputy Clerk
Atlanta, Georgia

# United States Court of Appeals
### Eleventh Circuit
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

**John Ley**
Clerk of the Court

For rules and forms visit
www.ca11.uscourts.gov

2011 JUL
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

July 06, 2011

Sheryl L. Loesch
Clerk, U.S. District Court
801 N FLORIDA AVE RM 220
TAMPA FL 33602-3849

**Appeal Number: 08-14538-HH**
Case Style: John Coffin v. Stacy Brandau
District Court Number: 07-00835 CV-T-26-TBM

The enclosed certified copy of the judgment and a copy of this court's opinion are hereby issued
as the mandate of this court.

The clerk of the court or agency shown above is requested to acknowledge receipt on
the copy of this letter enclosed to the clerk.

A copy of this letter, and the judgment form if noted above, <u>but not a copy of the court's
decision</u>, is also being mailed to counsel and pro se parties. A copy of the court's decision
was previously mailed to counsel and pro se parties on the date it was issued.

Sincerely,

John Ley, Clerk of Court

Reply To: James O. Delaney (404) 335-6113

Encl.

MDT-1 (06/2006)